FRENCH KREME CO. ET AL. *v.* UNITED STATES (No. 3034[1])

United States Court of Customs Appeals, May 7, 1928

*Frank P. Wilson* (*Bert Hanson* of counsel) for appellants.
*Charles D. Lawrence*, Assistant Attorney General (*Marcus Higginbotham*, special attorney, of counsel), for the United States.
*Thomas J. Doherty, amicus curiae.*

Oral argument February 10, 1928, by Mr. Hanson, Mr. Lawrence, and Mr. Doherty

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

Merchandise, consisting of egg yolk in the form of powder and described in the several invoices as "Spray Hen Yolk," "Dried Spray Egg Yolk," "Dried Hen Egg Yolk," and "Hen Egg Yolk-Spray," was assessed for duty by the collector at the port of New York at 18 cents per pound under paragraph 713 of the Tariff Act of 1922 as "dried egg yolk."

Paragraph 713 reads as follows:

PAR. 713. Eggs of poultry, in the shell, 8 cents per dozen; whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved, and not specially provided for, 6 cents per pound; dried whole eggs, dried egg yolk, and dried egg albumen, 18 cents per pound.

It was claimed by the importers in the protests that the merchandise was dutiable at only 6 cents per pound under paragraph 713, as "Egg yolk * * * prepared or preserved, and not specially provided for."

---

[1] T. D. 42768.

It appears from the testimony of the witness, Fletcher, who testified for the importer, that the involved egg yolk, represented by Exhibit A, has been subjected to the following processes:

\* \* \* The eggs are broken, separated, passed through a screen in order to break the skin, until you have a small mass, then poured under pressure and forced through pipes through the top of a chamber which would be approximately 18 to 20 feet wide and 30 to 40 feet tall. The eggs come through a nozzle or spray at the top of this chamber and are dropped out to the center of the chamber in a fine mass. In dropping through this chamber they pass through a 4-foot wave of warm air *which has a tendency to dry out a certain amount of the moisture; but it does not in any way affect the fats of the egg, leaves the egg uncooked, uncoagulated.* There is a certain process that they use before they put these eggs through the screen which was a secret German proposition. I never was initiated into the details of that although I have been through the mechanical work of many plants, the largest of which was Putty Foo.

\* \* \* \* \* \* \*

The temperature in that chamber is about 180° and in some cases it may run up to 200°. The reason why the material is not affected by the slightest coagulating is the same as when you drop a drop of water on a hot stove. You see the drop runs all over the top of the stove, and in the inside of that drop, according to chemists, it is stone cold. When this egg [meaning the small particles of the egg yolk] gets heated the egg itself takes a globular shape and the moisture inside is all cold. *This evaporation process takes place and the removal of this moisture the egg itself* [the witness is referring to the small particles of egg yolk] *becomes old and only evaporates the outside by the time it passes through this 4-foot heated area.*

\* \* \* \* \* \* \*

Q. Is the egg subjected to any heat before it gets to the nozzle?—A. No, sir.

Q. The heat is in the chamber after it passes out of the nozzle?—A. Yes, sir; it is not continuous; there is no contact with heat.

Q. Just while it is passing through?—A. Yes, sir.

Q. It is under pressure when it comes out of the nozzle?—A. It comes out either by hot air or steam that breaks it up.

Q. When it comes out of the nozzle is it in particles the same as the illustrative Exhibit A?—A. *Well, it would be in particles the same as the Exhibit A if these particles had the water with them; it still has moisture with the egg when it leaves the nozzle.*

Q. It passes through the blanket or layer of hot air.?—A. Yes, sir.

Q. And falls into some receptacle?—A. They fall down a conical shaped drain out through the bottom.

Q. When they drain out are they this commodity?—A. Yes, sir. (Italics ours.)

The witness also described the various methods of preparing "granular" or "native" egg yolk, which is represented in the record by Exhibit B and conceded by the importers to be dried egg yolk. He said:

The WITNESS. Yes, sir; this illustrative Exhibit B is manufactured—the natives manufacture it in a very primitive way, they put the eggs in a pan, bake it in the pan until they get a dry mass and then grind it up between stones.

Justice WAITE. That is the way it is made, dried and ground?

The WITNESS. Yes, sir.

By Mr. WILSON:

Q. You are speaking of the egg yolk now?—A. Yes.

Q. Mr. Fletcher, are not there other methods of producing the Exhibit B except baking in the pan?—A. Yes, it is also dried on a heated surface; in a commercial way they dry it in drums, where they spill it on one side of a heated drum and scrape it off with a knife and then grind it.

Q. Ground afterwards?—A. Yes, sir.

It appears from the record that the processing to which the imported merchandise, Exhibit A, has been subjected has removed all but from 3 to 6 per cent of moisture. It is readily soluble in water. It is known in the trade, according to the witness for importers, as "spray egg yolk," "soluble egg yolk," and "processed sprayed egg yolk" and is sold to the baking, mayonnaise, and ice cream industries. The same witnesses stated that "granular" or "native" egg yolk, Exhibit B, due to the cooking process to which it is subjected, contains only from 2.5 to 3 per centum of moisture, is not soluble in water, and can not be used for the making of ice cream, mayonnaise, or sponge cake, but can be used only for the making of noodles and "flat cakes, cookies, when there is no spring, or springy properties of the cake desired. In other words, it is used as egg flavor in those cakes"; that it is known in the trade as "granular egg yolk," "native egg yolk," and "dried egg yolk"; and that Exhibit A is a better product, adaptable to more uses, and sells in the market for about twice as much as the merchandise represented by Exhibit B. Some of the importers' witnesses were interrogated concerning commercial designation. The following testimony of the witness Clarence M. Pitt is illustrative of the method employed by counsel for importers to prove commercial designation:

Q. Was the expression dried egg yolk used in the wholesale trade and commerce in the United States on and before September 21, 1922?—A. It was.

Q. How long had you known it to be so used?—A. For 16 years.

Q. Prior to September, 1922?—A. Sixteen years altogether.

Q. In the course of your business did you become familiar with the expression dried egg yolk as that expression was used and understood in the wholesale trade and commerce of the United States on or before September 21, 1922?—A. I did.

Q. When so used was the expression dried egg yolk used in only a part of the United States or throughout the whole of the United States?—A. Throughout the whole of the United States.

Q. When so used has the expression dried egg yolk had the same meaning everywhere in the United States?—A. It did.

Q. When so used was the expression dried egg yolk understood by the whole trade?—A. It was.

Q. When so used was the expression dried egg yolk uncertain or certain of understanding?—A. It was certain of understanding.

Q. So long as you were familiar with that expression was the trade understanding and the expression dried egg yolk always the same before September 21, 1922?—A. It was always the same.

Q. Then used by the wholesale trade and commerce of the United States on or before September 21, 1922, did the expression dried egg yolk include or exclude merchandise such as that represented by the Exhibit A before you?—A. It excluded this.

Q. What is that merchandise?—A. This is sprayed egg yolk.

Some of the witnesses for importers, when asked whether the imported merchandise was not in fact "dried egg yolk," replied in the affirmative.

The witness, Louis Price, on cross-examination said

Q. Both the Exhibit A and the Exhibit B are dried egg yolk, are they not?—
\* \* \* \* \* \* \*
A. They are both dried egg yolk, these exhibits are both dried egg yolk.

On redirect examination he said:

Q. You say they are both sold as dried?—A. He asked if I recognized them as dried. I do.

Q. And you say they were both sold as dried?—A. Under the denomination, one spray egg yolk, the Exhibit A, and the other is granular or native dried.
\* \* \* \* \* \* \*
Justice WAITE: Well, what we want to know is whether you understand it as dried?

The WITNESS. Yes; we understand this is a process of drying.

The witness, Goldstein, said:

Q. The Exhibit A is dried egg yolk, is it not?—A. The Exhibit A is what is known as sprayed egg yolk.

Q. Is it dried?—A. It is spray egg yolk.

Q. Is it dried egg yolk?—A. It is spray processed dried egg yolk.

The witness, McNeill, said:

Q. Would you say as a matter of fact, not commercially, you call the other dry?—A. If I may explain, if you asked me for dried egg yolk you would get the Exhibit B. If you wished spray processed egg yolk you get the Exhibit A.

Q. As a man who handles the commodity would you, so far as being wet and dry, make a distinction between them?—A. I certainly would. If you asked me for dried egg yolk I would deliver the Exhibit B.

Q. Why?—A. Well, for instance, it is much cheaper, the dried, and I might be able to make a better profit on it.

Q. Now, I ask you whether or not there is any reason, outside of commercial designation and outside of commerce, for calling one of those commodities dry and the other not dry?—A. None.

The witness, Fletcher, said:

Q. As a matter of fact the Exhibit A was dried?—A. Spray processed.
Justice WAITE. You are avoiding the question.
The WITNESS. I am not avoiding the question. It seems to be dried in form
Justice WAITE. You have handled it?
The WITNESS. It is not as dry as starch and not as wet as water.

The witness, Clancy, referring to the method of processing Exhibit A, said:

Q. Well, drying?—A. No, it is not drying. It goes through a temperature——
Q. What is the temperature?—A. Varies from 200° to 260°, but very quickly, goes through very quickly, so it does not cook the egg.

Q. Does not cook it?—A. Has not got time to cook it, it shoots it through.

Q. What is the use of shooting it through?—A. In order so it would not be shipped in a wet state.

Q. Dries it out then, does it?—A. To a certain extent.

Q. How does it come out of this drier?—A. Exactly like this (referring to the illustrative Exhibit A). ··

. Q. Then this condition has been arrived at by simply taking away the moisture?—A. The moisture to a certain extent, yes; there is still some moisture left in it.

The Government submitted evidence tending to show that the common and commercial understanding of the descriptive term "dried egg yolk" were the same; that the imported merchandise, Exhibit A, was known and sold in the trade as "dried egg yolk"; and that the qualities of egg yolk represented by Exhibits A and B were used for the same purposes. It was conceded, however, that Exhibit A was a better quality than Exhibit B, and commanded a higher price in the market; and that it was more difficult to dissolve the "granular" or "native" egg yolk, Exhibit B.

The court below, in an opinion by Waite, Justice (Adamson, Justice, dissenting) held that the involved merchandise was in fact dried egg yolk; and that importers had failed to establish by a preponderance of the evidence that the descriptive term "dried egg yolk" had a restricted meaning in the trade and commerce of the United States, which excluded the merchandise in question. Accordingly, the protests were overruled.

It is claimed by importers that egg yolk prepared by the "spray process" is not recognized in the trade as dried egg yolk and that it is dutiable as "egg yolk  *  *  *  prepared or preserved," at 6 cents per pound under paragraph 713.

The Government, on the contrary, contends that the merchandise is bought and sold and recognized in the trade, and is in fact "dried egg yolk"; and that it is dutiable as such under paragraph 713 at 18 cents per pound.

The "granular" or "native" egg yolk (admittedly dried in a tariff sense) is dried by cooking. It is then ground. The involved merchandise is prepared by a more elaborate process. It is forced through a stratum of heated air "very quickly so it does not cook" the particles of egg yolk. The obvious and admitted purpose of this preparation is to reduce the quantity of moisture in the egg yolk without subjecting it to a cooking process. The reason for this is clear. When cooked, the yolk will not dissolve readily in water, and will not form a perfect solution. So, the uses of egg yolk, dried by a cooking process, are somewhat limited. Egg yolk prepared by the "spray" process, although dried, remains in a raw state. It is readily soluble in water, and, when dissolved, has the properties and uses of undried raw egg yolk. Obviously, if the "spray" process reduces the moisture in the egg yolk to such an extent as to put it in a dry, powdered form, even though it is in an uncooked state, it is "dried" within the common meaning of the term. One of the witnesses said that the involved merchandise

was subjected to a secret German process before it was broken into small particles and forced through the warm air. However, there is nothing in the record to indicate what this process is, nor what effect, if any, it has on the merchandise.

, It has been fully established, we think, that the merchandise in question is dried egg yolk. It is superior in quality, commands a higher price—about twice as much—and is adaptable to a greater variety of uses than the "granular" or "native" dried egg yolk. There seems to be no logical reason why it should bear a less rate of duty than an inferior quality of the same kind of merchandise.

However, it is claimed that this particular kind of dried egg yolk is excluded, by the trade and commerce of the United States, from the descriptive term used in the statute. Evidence was introduced on the trial to substantiate this contention. It appears therefrom that the merchandise was bought and sold as "spray egg yolk," "soluble egg yolk," and "processed sprayed egg yolk"; and that it was not included in the expression "dried egg yolk." There is no direct evidence of the trade understanding of the term "dried egg yolk." It does appear from the testimony of the witnesses for the importer that it is not bought and sold under the descriptive term "dried egg yolk"; and that it is known in the trade by names indicating the processes to which it has been subjected. Assuming, for the purpose of this discussion, that these facts have been established: Are they sufficient to prove that, in the trade and commerce of the United States, the descriptive term "dried egg yolk" has a distinctive meaning different from the common meaning? We think not. If evidence of this character is sufficient to remove imported merchandise from a descriptive designation, all merchandise bought and sold under selective trade terms could be excluded by this character of proof from appropriate descriptive tariff designations. *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184.

Had it been established by a preponderance of the evidence that, in the trade and commerce of the United States, the term "dried egg yolk" had a restricted meaning, which included only such egg yolk as had been dried by a "cooking process," the importers might be justified in complaining of the judgment below. *La Manna, Azema & Farnan* v. *United States*, 14 Ct. Cust. Appls. 289, T. D. 41908; *Central Warehouse Co.* v. *United States*, 14 Ct. Cust. Appls. 315, T. D. 41914, and cases cited therein.

The Government submitted evidence tending to prove that the merchandise was known in the trade as "dried egg yolk." The court below was called upon to determine this issue according to the weight of the evidence. It held with the Government and against the importers. We are of opinion that the court was justified in so holding.

The judgment is *affirmed*.