FRENCH KREME CO. ET AL. *v.* UNITED STATES (No. 3325) [1]

United States Court of Customs and Patent Appeals, December 19, 1930

*Frank P. Wilson* (*Bert Hanson* of counsel) for appellant.

*Charles D. Lawrence,* Assistant Attorney General (*Marcus Higginbotham, jr.,* of counsel), for the United States.

[Oral argument October 8, 1930, by Mr. Hanson and Mr. Higginbotham]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court.

[1] T. D. 44505.

Merchandise, consisting of dried egg yolk in the form of powder, was assessed for duty by the collector at the port of New York at 18 cents per pound under paragraph 713 of the Tariff Act of 1922.

PAR. 713. Eggs of poultry, in the shell, 8 cents per dozen; whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved, and not specially provided for, 6 cents per pound; dried whole eggs, dried egg yolk, and dried egg albumen, 18 cents per pound.

The importers protested, claiming that the merchandise was properly dutiable as egg yolk prepared or preserved, not specially provided for, at only 6 cents per pound under paragraph 713.

One protest—177424–G—was dismissed as untimely by the court below. The other protests were overruled.

Like merchandise and issues similar to those presented by this appeal were before this court in the case of French Kreme Co. et al. v. United States, 16 Ct. Cust. Appls. 126, T. D. 42768. We there held that the merchandise was "dried egg yolk" within the common meaning of the descriptive statutory term; and that the importers had failed to establish by a preponderance of the evidence that the merchandise was excluded from the statutory term by commercial designation.

The record in that case, as well as considerable additional testimony, was introduced by counsel for the importers in the case at bar for the purpose of establishing commercial designation. In our former decision we described the merchandise, summarized the evidence, and stated and disposed of the issues in the following language:

It appears from the record that the processing to which the imported merchandise, Exhibit A, has been subjected has removed all but from 3 to 6 per centum of moisture. It is readily soluble in water. It is known in the trade, according to the witness for importers, as "spray egg yolk," "soluble egg yolk," and "processed sprayed egg yolk" and is sold to the baking, mayonnaise, and ice-cream industries. The same witnesses stated that "granular" or "native" egg yolk, Exhibit B, due to the cooking process to which it is subjected, contains only from 2.5 to 3 per centum of moisture, is not soluble in water, and can not be used for the making of ice cream, mayonnaise, or sponge cake, but can be used only for the making of noodles and "flat cakes, cookies, when there is no spring, or springy properties of the cake desired. In other words, it is used as egg flavor in those cakes"; that it is known in the trade as "granular egg yolk," "native egg yolk," and "dried egg yolk"; and that Exhibit A is a better product, adaptable to more uses, and sells in the market for about twice as much as the merchandise represented by Exhibit B.

\*   \*   \*   \*   \*   \*   \*

The "granular" or "native" egg yolk (admittedly dried in a tariff sense) is dried by cooking. It is then ground. The involved merchandise is prepared by a more elaborate process. It is forced through a stratum of heated air "very quickly so it does not cook" the particles of egg yolk. The obvious and admitted purpose of this preparation is to reduce the quantity of moisture in the egg yolk without subjecting it to a cooking process. The reason for this is clear. When cooked, the yolk will not dissolve readily in water, and will not form a perfect

solution. So, the uses of egg yolk, dried by a cooking process, are somewhat limited. Egg yolk prepared by the "spray" process, although dried, remains in a raw state. It is readily soluble in water, and, when dissolved, has the properties and uses of undried raw egg yolk. Obviously, if the "spray" process reduces the moisture in the egg yolk to such an extent as to put it in a dry, powdered form, even though it is in an uncooked state, it is "dried" within the common meaning of the term. One of the witnesses said that the involved merchandise was subjected to a secret German process before it was broken into small particles and forced through the warm air. However, there is nothing in the record to indicate what this process is, nor what effect, if any, it has on the merchandise.

It has been fully established, we think, that the merchandise in question is dried egg yolk. It is superior in quality, commands a higher price—about twice as much—and is adaptable to a greater variety of uses than the "granular" or "native" dried egg yolk. There seems to be no logical reason why it should bear a less rate of duty than an inferior quality of the same kind of merchandise.

However, it is claimed that this particular kind of dried egg yolk is excluded, by the trade and commerce of the United States, from the descriptive term used in the statute. Evidence was introduced on the trial to substantiate this contention. It appears therefrom that the merchandise was bought and sold as "spray egg yolk," "soluble egg yolk," and "processed sprayed egg yolk"; and that it was not included in the expression "dried egg yolk." There is no direct evidence of the trade understanding of the term "dried egg yolk." It does appear from the testimony of the witnesses for the importer that it is not bought and sold under the descriptive term "dried egg yolk"; and that it is known in the trade by names indicating the processes to which it has been subjected. Assuming, for the purpose of this discussion, that these facts have been established: Are they sufficient to prove that, in the trade and commerce of the United States, the descriptive term "dried egg yolk" has a distinctive meaning different from the common meaning? We think not. If evidence of this character is sufficient to remove imported merchandise from a descriptive designation, all merchandise bought and sold under selective trade terms could be excluded by this character of proof from appropriate descriptive tariff designations. *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184.

Had it been established *by a preponderance of the evidence* that in the trade and commerce of the United States, the term "dried egg yolk" had a restricted meaning, which included only such egg yolk as had been dried by a "cooking process," the importers might be justified in complaining of the judgment below. *La Manna, Azema & Farnan* v. *United States*, 14 Ct. Cust. Appls. 289, T. D. 41908; *Central Warehouse Co.* v. *United States*, 14 Ct. Cust. Appls. 315, T. D. 41914, and cases cited therein. [Italics not quoted.]

With regard to the additional evidence introduced on the trial below, it may be said that some of the witnesses testified that they first heard of the involved merchandise about 1921, and that they commenced to deal in it at about that time. They said that the involved merchandise—represented by Exhibit A—was known in the trade as "spray egg yolk," "spray-processed egg yolk," and "soluble egg yolk"; that egg yolk dried by a cooking process—represented by Exhibit B—was known in the trade as "granular" or "native" dried egg yolk. Some testified that on an order for "dried egg yolk" they would deliver merchandise represented by Exhibit B, while others said that on receipt of such an order they would inquire of the

prospective purchaser as to the purposes for which it was desired, and would explain the difference between the "granular" or "native" egg yolk and that produced by the spray process.

The witness, Joe Lowe, testified for the importers. He said that he had commenced to sell the involved merchandise in 1921; that it was not known in the trade as dried egg yolk and was not included within the commercial understanding of that term; but that he did not hear his competitors discuss the term by which the involved merchandise was bought and sold because he was not on friendly terms with them.

The witness, Shepphard, testified that the trade he visited included within the term "dried egg yolk" only such egg yolk as was dried by a cooking process. He also said that if he received an order for dried egg yolk it would be necessary for him to inquire as to "what kind you wanted and what you wanted to use it for."

The witness, Nyegoe, testified that the imported merchandise was not included within the trade understanding of the term "dried egg yolk" and that the trade understanding was uniform. However, upon cross-examination he said that by the term "uniform" he meant that "everybody had the same thing in their minds about the same class of goods, they knew how cakes baked with this class of goods would come out uniform, about the same texture, doing the same kind of work, while when using the other (Exhibit B) the result did not come out alike." He further said:

Q. So I understand your understanding of the word "uniform" means the result arrived at by the use of Exhibits A and B?—A. Yes.

Q. Not the understanding as to the designation or name of each article?—A. Well, I never thought—I never gave that a thought.

The witness, Cabell, without giving any trade definition or understanding of the statutory term "dried egg yolk," testified that the involved merchandise was excluded therefrom. On cross-examination, among other things, he said:

Q. Exhibit B you always knew as dried egg yolk?—A. Yes.

Q. Then there came on the market an improved product known as "spray-processed dry egg yolk" like Exhibit A?—A. Yes, sir.

Q. *That is a finer product, better quality egg yolk?*—A. *Better quality.*

Q. Dried by the spray process?—A. Yes.

Q. You thereupon went out and sold the spray-process dry yolk to the bakers because you felt they could use it for the same purposes?—A. Because I knew it would be better.

Q. You sold it to them as dried egg yolk?—A. I sold Exhibit A as spray egg yolk.

Q. Spray-process dried egg yolk?—A. No, spray egg yolk.

Q. Dried by the spray process?—A. Spray egg yolk.

Q. If you received an order for 50 pounds of dried egg yolk what would you send?—A. I would send dried egg yolk.

Q. If you had none of the Exhibit B in your stock what would you send him?—A. I would first write him and tell him the difference between the two.

Q. *I am a baker, I am sending you an order for 50 pounds of dried egg yolk——*
A. *I would first write to tell you the difference between the two before I would fill the order.* [Italics ours.]

The witness, Braff, testified that he commenced selling the involved merchandise, Exhibit A, about 1920; and that at that time the descriptive term "dried egg yolk" was well known in the trade and,. in his experience, was understood by the trade to cover "granular" or "native" egg yolk.

The Government relied upon the commercial testimony introduced by it in the record in the former case. Its witnesses—six in number—testified that the involved merchandise was bought and sold and known in the trade as "dried egg yolk,"\* and by other terms, such as "spray egg yolk," "spray-processed dried egg yolk," and "soluble egg yolk," to differentiate it from the "granular" or "native" dried egg yolk. Their experience territorially and otherwise was as extensive as that of the witnesses for the importers.

It would seem to be obvious that during that period of time when the trade was dealing in but one quality of "dried egg yolk,"—that is, the "native" or "granular" type—produced by a cooking process, its understanding would be limited to the only kind of which it had any knowledge. When the "spray-processed dried egg yolk" was introduced into the commerce of the United States it was necessary, of course, for the trade to distinguish, in some manner or other, between the two grades or qualities. This was accomplished by referring to the new product in terms indicating either the process by which it was dried or its claimed superior qualities. It does not follow, however, either as a matter of course or from the evidence in the case, that the trade developed a new and distinctive meaning for the descriptive statutory term "dried egg yolk." But, however this may be, the most that can fairly be said in support of the proposition that commercial designation has been established is that the evidence upon the subject is conflicting.

We conclude our discussion of commercial designation with the observation made in the former case:

\* \* \* The court below was called upon to determine this issue according to the weight of the evidence. It held with the Government and against the importers. We are of opinion that the court was justified in so holding.

Counsel for appellants contend that the court below erred in dismissing, as untimely, protest 177424–G, as to entry warehouse bond 52743.

It appears from the record that the motion to dismiss the protest in question was not made until all the evidence in the case had been introduced by the parties; and that the issues raised by this protest were the same as those involved in the other protests before the court below.

In view of the conclusion we have reached on the merits of the case, it is unnecessary for us to consider the questions raised by this assignment of error.

For the reasons stated the judgment is *affirmed*.