UNITED STATES *v.* D. L. Moss & Co. (No. 3685)[1]

---

[1] T. D. 47159.

250

United States Court of Customs and Patent Appeals, May 31, 1934

*Charles D. Lawrence*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Halstead* (*Samuel M. Richardson* of counsel) for appellee.

[Oral argument December 7, 1933, by Mr. Lawrence and Mr. Richardson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court holding certain "powdered egg albumen" dutiable as "egg albumen * * * otherwise prepared or preserved, and not specially provided for" at 11 cents per pound under paragraph 713 of the Tariff Act of 1930, as claimed by the importer, rather than as "dried egg albumen" at 18 cents per pound under that paragraph, as claimed by the Government and as assessed for duty by the collector at the port of New York.

Paragraph 713 reads:

PAR. 713. Eggs of poultry, in the shell, 10 cents per dozen; whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved, and not specially provided for, whether or not sugar or other material is added, 11 cents per pound; dried whole eggs, dried egg yolk, and dried egg albumen, whether or not sugar or other material is added, 18 cents per pound.

On the trial in the court below, appellee called four witnesses, Louis P. Schrag, John T. Doyle, Abram S. Dutcher, and Erwin G. Tepfer.

The witness Schrag stated that he was in the business of importing egg products from China. He identified a sample of the imported egg albumen, which was introduced in evidence as Exhibit 1. He also identified Illustrative Exhibit A, which he said was dried egg albumen.

Exhibit 1 consists of a small bottle containing powdered egg albumen, light yellow in color.  Illustrative Exhibit A consists of a bottle containing dried egg albumen in small pieces or crystals, light amber in color.

The witness Schrag stated that dried egg albumen, of which Illustrative Exhibit A is representative, was accurately described in the decision of this court in the case of *F. H. Shallus & Co. et al.* v. *United States*, 18 C.C.P.A. (Customs) 332, T.D. 44585, where it was held that similar merchandise was provided for in paragraph 713 of the Tariff Act of 1922 both as "dried", and as "prepared", egg albumen, but more specifically as "dried egg albumen."  He further stated that the imported merchandise, of which Exhibit 1 is representative, was manufactured from dried egg albumen, of which Illustrative Exhibit A is representative, by the following process: "This material represented by illustrative exhibit A is placed in a funnel of a pulverizing machine, and the material is subjected to pounding and friction for a certain length of time, and then the material represented by exhibit 1 is ejected at the other end of the pulverizing machine, and comes out in this powdered form"; that he was the owner of the only factory in China where powdered albumen was prepared by that process; that he had sold merchandise similar to that here involved, and also that of which Illustrative Exhibit A is representative, throughout a considerable portion of the United States for many years prior to the enactment of the Tariff Act of 1930; that the term "dried egg albumen" has been used in the trade since 1917; that the trade with which he came in contact designated merchandise, of which Illustrative Exhibit A is representative, as "dried egg albumen"; that the term "dried egg albumen" had a definite, uniform, and general meaning in the trade and commerce of the United States; and that the involved merchandise was bought and sold in the trade and commerce of the United States as "powdered egg albumen", and as "powdered hen-egg albumen."  The witness was then asked the following question: "I now ask you whether or not the term 'dried egg albumen' which we have been discussing, as used in the wholesale trade and commerce of the United States, from 1917 until June 17, 1930, includes or excludes the powdered albumen similar to exhibit 1?"  In reply thereto, he said: "It has excluded the material represented by exhibit 1."  He further stated that the involved and similar "powdered egg albumen" was used in the manufacture of meringue powder; that it was instantly soluble in water, whereas the material from which it was manufactured, represented by Illustrative Exhibit A, was not instantly soluble in water, and could not be used in the manufacture of meringue powder; that dried egg albumen in the form of powder, produced by the "spray process", which process consists in "shooting liquid egg

whites through nozzles into a hot chamber and instantaneously drying them", was also known in the trade as "dried egg albumen"; that dried egg albumen produced by the spray process was not suitable for use in the manufacture of meringue powder; and that if he received an order for "100 cases of dried egg albumen in powdered form", he would ship merchandise similar to that here involved.

The witness Doyle stated that he was department manager of Habicht Braun & Co., which company was engaged in the business of importing eggs and other products; that he had sold merchandise similar to Exhibit 1, and also merchandise similar to Illustrative Exhibit A, throughout the United States prior to the enactment of the Tariff Act of 1930; and that the term "dried egg albumen" had a definite, uniform, and general meaning in the trade and commerce of the United States. The witness was then asked the following question: "Then, as used by the wholesale trade and commerce of the United States, in this territory, on and before June 17, 1930, did the expression 'dried egg albumen' include or exclude merchandise such as represented by exhibit 1?" He replied that, "It excluded Exhibit 1". He further stated that egg albumen, of which Exhibit 1 is representative, is instantly soluble in water, and is chiefly used in the manufacture of meringue powder; that egg albumen, of which Illustrative Exhibit A is representative, does not dissolve instantly in water [requiring 8 to 10 hours], and is sold to manufacturers of confections for use in making candies; that powdered albumen, of which Exhibit 1 is representative, is made by simply pulverizing dried egg albumen, of which Illustrative Exhibit A is representative; that, due to the fact that the imported merchandise is in the form of a fine powder, it is more valuable for certain purposes; that "powdered albumen" is advanced in manufacture, but not in value; and that if he received an order for "100 cases of dried egg albumen, in powdered form", he would be confused by the order, and would inquire as to whether "dried egg albumen" or "powdered albumen" was desired.

The witness Dutcher stated that he was vice-president of Wood & Selick, engaged in the business of "confectioners' and bakers' supplies"; that he had sold merchandise, of which Exhibit 1 is representative, and also merchandise of which Illustrative Exhibit A is representative, to the baking and confection trade; that the two products were, to a certain extent, used interchangeably; that the term "dried egg albumen", had a definite, uniform, and general meaning in the trade and commerce of the United States; that powdered egg albumen, similar to that here involved, was excluded from the term "dried egg albumen", as used by the wholesale trade; that, to his knowledge, "powdered egg albumen" had never been known in the trade as "dried egg albumen"; that dried egg albumen, as repre-

sented by Illustrative Exhibit A, was "the first stage of exhibit 1";
and that the imported merchandise was "simply dried egg albumen,
pulverized."

The witness Tepfer testified that he was an importer of Chinese
products; that he had sold merchandise, of which Illustrative Exhibit
A is representative, and also merchandise of which Exhibit 1 is repre-
sentative, since about 1917 in many cities in the United States as far
west as Los Angeles; that the term "dried egg albumen" had a definite
meaning in the trade and commerce of the United States; and that he
was familiar with that meaning. He was then asked the following
question: "Then, as so used by the wholesale trade in the territory
which you have described, on and before June 17, 1930, would you
state that that expression, 'dried egg albumen', included or excluded
the merchandise represented by exhibit no. 1?", to which he replied:
"It excludes it."

The Government called two witnesses, H. E. Shackleton and E.
N. Fitzsimons. They testified that they had purchased egg albumen
similar to that herein involved. However, as their purchases "were
not in usual wholesale quantities", their testimony, together with
Illustrative Exhibit C and Exhibits 3 and 4, identified by them and
offered in evidence by counsel for the Government, was rejected by
the trial court. The correctness of the court's ruling excluding that
evidence has not been challenged in this court by appellant in its
assignment of errors, and, therefore, will not be considered.

On this record, the court below sustained the protest holding that—

Regardless of whether the milling process has made a new product possessing
different qualities, we are compelled to decide this case upon the preponderance
of the evidence, and the preponderance of the testimony in this case is clearly
to the effect that this commodity has been removed from the commonly accepted
meaning of the term "dried egg albumen", as contemplated by the tariff act and
as interpreted by the previous decision, and has become egg albumen otherwise
prepared and known to the trade as powdered egg albumen.

It is contended by counsel for the Government that the involved
merchandise is, in fact, dried; that the Congress intended by the
descriptive term "dried egg albumen", contained in paragraph 713,
*supra*, to include all forms or classes of dried egg albumen; that that
term was intended by the Congress to be applied in accordance with
its common meaning; and that, therefore, proof of commercial
designation is irrelevant. Counsel for the Government further con-
tend that if proof of commercial designation is relevant, appellee
has failed to establish that the descriptive term "dried egg albumen"
had a definite, uniform, and general meaning throughout the trade
and commerce of the United States at or immediately prior to the
enactment of the Tariff Act of 1930, different from its common
meaning; that the involved merchandise is nothing more than "dried

egg albumen" in powdered form; and that it is not, therefore, "a new article of commerce, separate and distinct from dried egg albumen."

Counsel for appellee, on the other hand, contend that the language of paragraph 713, *supra*, and its legislative history, indicate that the Congress did not intend that the statutory term "dried egg albumen" should be limited to its common meaning. In support of that proposition, counsel for appellee has called our attention to a "Memorandum of Court Decisions Affecting Tariff Act of 1922. Prepared for the use of the Committee on Ways and Means, House of Representatives", where, at page 29, attention of the committee was called to the decision of this court in the case of *French Kreme Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 126, T.D. 42768, where it was held, according to the memorandum, that "egg yolk in the form of powder dried by a spraying process, was dutiable as dried egg yolk at 18 cents per pound * * * ." It was further stated in the memorandum that—

* * * a new case is being made up, and a question as to the commercial meaning of the terms used will arise.

In order to prevent further litigation in the next act, it may be advisable to amend the provision. If the words "by whatever process produced" were inserted after the word "albumen," further litigation may be avoided, making the provision read, "dried whole eggs, dried egg yolk, and dried egg albumen, *by whatever process produced.*"

With reference to the quoted excerpt, counsel for appellee in their brief state:

Legislation using such language might have suggested the elimination of commercial designation as a means to discover the congressional intent in the use of the words "dried egg albumen." The failure of Congress to act on the suggestion of this report clearly indicates that there was no intent to depart from the usual method of construction so far as commercial designation is concerned.

This is especially so, where in the *French Kreme* case, called to the attention of Congress by this report, this court specifically held that sufficient proof of commercial designation would be admissible and controlling.

It is further argued by counsel for appellee that the evidence of record establishes that the term "dried egg albumen" had a definite, uniform, and general meaning in the trade and commerce of the United States at and prior to the enactment of the Tariff Act of 1930 different from its common meaning; that the involved merchandise, which was sold as "powdered egg albumen", was excluded from the commercial meaning of the term "dried egg albumen"; that appellee accepted as a formula for establishing commercial designation, in the case at bar, a statement by this court in its decision in the *French Kreme Co. et al.* case, *supra;* and that the evidence shows that the term "dried egg albumen" had a restricted meaning in the trade and commerce of the United States which included egg albumen, of which

Illustrative Exhibit A is representative, and excluded powdered egg albumen, of which Exhibit 1 is representative.

The statement in the *French Kreme Co. et al.* case, referred to by counsel for appellee, reads as follows:

Had it been established by a preponderance of the evidence that, in the trade and commerce of the United States, the term "dried egg yolk" had a restricted meaning, which included only such egg yolk as had been dried by a "cooking process", the importers might be justified in complaining of the judgment below. *La Manna Azema & Farnan* v. *United States*, 14 Ct. Cust. Appls. 289, T.D. 41908; *Central Warehouse Co.* v. *United States*, 14 Ct. Cust. Appls. 315, T.D. 41914, and cases cited therein.

Counsel for appellee further contend that, although the involved merchandise was prepared by pulverizing "dried egg albumen", of which Illustrative Exhibit A is representative, it is a new article having a new name and use, and is, therefore, not dutiable as "dried egg albumen." In support of that contention, counsel for appellee rely upon the decisions in the following cases: *Merck* v. *United States*, 151 Fed. 14; *Rossman* v. *United States*, 1 Ct. Cust. Appls. 280, T.D. 31231.

In the case of *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T.D. 42641, this court, in discussing the character of proof necessary to establish commercial designation, said:

* * * If, under our holding in the *Chicago Wool Co.* case, *supra*, proof of commercial designation may be permitted in respect to the meaning of the language of said paragraph 1102, which question is not here involved, such proof must be, under the authorities, that at and before the time of the enactment of the Tariff Act of 1922 the term "wool in the scoured state" had a definite, uniform, and general meaning in the trade and commerce of the country, other than its ordinary meaning; this proof may then be followed by proof showing what such meaning was, and that the wool in question was not included therein. *United States* v. *Kwong Yuen Shing*, 1 Ct. Cust. Appls. 14, T.D. 30773; *United States* v. *Wells Fargo & Co.*, 1 Ct. Cust. Appls. 158, T.D. 31211; *United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, T.D. 31277; *Maine Central R.R. Co.* v. *United States*, 14 Ct. Cust. Appls. 411, T.D. 42054.

In discussing the question of commercial designation in the *French Kreme Co. et al.* case, *supra*, it was pointed out that there was *no evidence of the commercial meaning* of the term "dried egg yolk", and that as the merchandise there involved was "dried egg yolk", within the common meaning of the statutory term, evidence establishing that it was bought and sold and known in the trade by names "*indicating the process to which*" it had been subjected was not sufficient to establish commercial designation. (Italics not quoted.) See also *United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, 371, T.D. 43029, where it was stated that, if an imported article was within the common meaning of a tariff term, the "mere fact that it was not known in the trade by the precise tariff term would not affect its

classification." Accordingly, the mere fact that the involved merchandise, dried, within the common meaning of the descriptive term "dried egg albumen", is bought and sold in the trade and commerce of the United States as "powdered albumen" does not affect its classification.

The quoted excerpt from our decision in the *French Kreme Co.* case, *supra*, was not intended as a "formula" for establishing commercial designation generally, but had application to the facts in that case only. It may be observed, furthermore, that the suggestion there made was not followed by appellee; that is, in the instant case, appellee has failed to establish the *commercial meaning* of the term "dried egg albumen." The witnesses testified that it had a definite, uniform, and general meaning in the trade, but they did not state, nor were they asked, what that meaning was. They merely stated that the commercial meaning of the statutory term included merchandise of which Illustrative Exhibit A is representative, and excluded the involved and similar merchandise. Such statements, of course, are mere conclusions. They were not based upon related facts, and, therefore, do not even rise to the dignity of "opinion evidence".

The court may take judicial notice of the common meaning of a tariff term. Accordingly, in order to establish that such term has a meaning in the trade and commerce of the United States different from its common meaning, *it is necessary that its commercial meaning be established*. If that is done, the testimony that imported merchandise was included or excluded from the commercial meaning would, of course, be proper, as such proof would involve something more than the mere conclusions of the witnesses.

We have discussed the question of commercial designation solely because counsel for appellee evidently misunderstood the purport of the quoted excerpt from the *French Kreme Co.* case, *supra*. We are of opinion, however, for the reasons hereinafter stated, that proof of commercial designation was not relevant in the case at bar.

In the Summary of Tariff Information, 1929, on the Tariff Act of 1922, the Tariff Commission reported to the Committee on Ways and Means of the House of Representatives, relative to paragraph 713 of that act, volume 1, page 1078, that—

* * * Dried albumen is used in prepared whipping and meringue powders, which make a tough, durable meringue for cream and other soft pies. It also is used for cream centers and nougatines by candy makers, by manufacturers of marshmallow whips and creams, only a few of whom are able to use frozen whites, and by manufacturers of baking powders, none of whom can use frozen whites.

* * * * * * *

Imports of dried albumen have likewise increased because of the demand from confectioners and from makers of baking powders, whipping powders, and meringue powders.

It will be observed from the quoted excerpt from the Summary of Tariff Information that the Congress was fully aware that "dried albumen" was then being used in the manufacture of meringue powder, baking powder, and for other purposes.

It appears from the evidence in the case at bar that the imported merchandise is used for similar purposes.

In the report of the Committee on Ways and Means of the House of Representatives, relative to H.R. 2667 (which later became the Tariff Act of 1930), Tariff Readjustment, 1929, at page 74, relative to paragraph 713, we find the following:

> * * * The production of eggs in the Orient gives vigorous competition. The duty on dried-egg products (*which is intended to apply whether the drying is by spraying or any other process*) remains unchanged, since the domestic egg-freezing industry is the most efficient method for using undergrades, and surplus products in the heavy laying season, and frozen-egg products have largely displaced dried-egg products for uses where dried eggs can be replaced by frozen eggs. (Italics ours.)

Paragraph 713 was enacted by the Congress in the same form as reported to the House of Representatives by the Committee on Ways and Means, except that the rate of duty on "whole eggs, egg yolk, and egg albumen, frozen or otherwise prepared or preserved", was changed from 8 cents to 11 cents per pound.

It is evident, we think, from the quoted excerpts from the Summary of Tariff Information, and from the report of the Committee on Ways and Means of the House of Representatives, that the term "dried egg albumen" was intended by the Congress to include all "dried egg albumen" whether dried by the "spray", or other process, and whether imported in the form of powder or otherwise. Such interpretation of the term "dried egg albumen" avoids the anomaly of assessing "dried egg albumen", if in an advanced state—pulverized, at 11 cents per pound, and at the same time assessing "dried egg albumen" in a less advanced state—unpulverized, at the comparatively high rate of 18 cents per pound. The involved merchandise is egg albumen, dried and powdered. It is, therefore, provided for as "dried egg albumen" in paragraph 713, and more specifically provided for as such, than as egg albumen, prepared. *F. H. Shallus & Co.* v. *United States, supra.*

For the reasons herein stated, the judgment is *reversed.*