UNITED STATES *v.* FRANK (No. 2863)[1]

United States Court of Customs Appeals, May 7, 1927

*Charles D. Lawrence,* Assistant Attorney General (*William H. Futrell,* special attorney, of counsel), for the United States.

*Lamb & Lerch* (*John G. Lerch* of counsel) for appellee.

[1] T. D. 42184.

98

[Oral argument April 22, 1927, by Mr. Lawrence and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The merchandise imported in the case at bar consisted of steel sheet piling, with fabricated steel corner pieces and steel ramming heads. The piling was classified by the collector as steel, not specially provided for, under paragraph 304 of the Tariff Act of 1922, and the corner pieces and ramming heads as manufactures of steel, not specially provided for, under paragraph 399 of the same act. The importer protested, claiming the merchandise to be dutiable as structural shapes of steel not assembled, manufactured, or advanced, at one-fifth of 1 cent per pound, or at 20 or 25 per centum as such forms assembled or advanced, under paragraph 312 of said act, with an alternative claim as unenumerated manufactured articles under paragraph 1459 thereof.

On the hearing before the court below, the importer abandoned his claim as to the ramming heads involved. The Customs Court, after hearing the proofs submitted, sustained the protest, holding the steel piling dutiable at one-fifth of 1 cent per pound, and the corner pieces at 20 per centum ad valorem, under said paragraph 312. From this judgment the Government has appealed and now insists that the collector's classification was correct and should be sustained.

The piling involved here consists of steel pieces varying from 40 to 56 feet in length, 17 inches in width, and approximately three-eighths of an inch in thickness. A cross section shows the piling to be in the shape of an elongated flat arch, at each outside base of which the steel has been turned over to make an interlocking device. The piling has been made by the rolling process entirely. In using these, they are driven by a steam hammer or drop hammer, usually two at a time, the piling being placed alternately on either side of the neutral axis of the entire cross section of the sheet piling. The corner pieces are constructed by cutting one of the sections in two longitudinally, and then bolting the same together, by the use of an angle iron, in a way to secure the desired angle. The merchandise as imported is ready for use and is completely manufactured. There was some attempt in the court below to show that holes were bored in the piling, but we think it plainly appears that such holes were made after importation.

Seven witnesses were called in the court below on behalf of the Government and six on the part of the importer. From this testimony it appears that the particular merchandise imported here is intended for use at Rockaway Beach. At this place a highway bridge, having lift spans, runs across Rockaway Bay. In order to carry water pipes across the bridge, it is necessary to carry the pipes

under the channel at the draws. Steel sheet piling is driven to protect and retain the soil about the bridge piers and to form a cofferdam out of which the soil is drawn by a dredge. It is thus possible to carry the pipes across the draw and at the same time protect the bridge foundations. The question as to whether the piling shall be left in place for the permanent protection of the bridge can not be determined until the work is done.

The various witnesses who testified were, in the main, well qualified to speak of the uses of steel sheet piling. From their testimony it appears that such material is commonly used in the construction of dams, including core walls after installation, for building foundation work, including retaining walls and foundation piers, for dock walls, for elevator shafts, and for breakwaters. In using the piling in foundation work for buildings, it is shown that the piling is usually driven on both sides of the space intended for the foundation, the earth is then removed, and the space thus left is filled with concrete. When so used, it appears that the steel piling is usually not afterwards removed, and remains as a reinforcement of the concrete structure. It is also sometimes embedded in concrete and thus forms a part of the foundation. As examples of structures where such piling was so permanently installed, the Marshall Field Building in Chicago, the Astor House, Woolworth Building, and New York Tribune Building, in New York, two school buildings at Cleveland, Ohio, and many breakwaters, retaining walls, levees, tunnels, docks, dams, bridges, and similar works were cited. The testimony indicates that such piling is commonly used either for temporary or permanent use on most of the larger construction jobs. The only positive testimony as to the extent of such permanent use is found in the statements of Augustus R. Archer, a civil engineer, who states that at least 50 per centum of the steel piling used is used in permanent construction, and of Wilber J. Watson, a structural engineer, who states that at least one-half goes into permanent work. All the witnesses who testify upon that subject agree that the use of this material in building work is rapidly increasing. It is also shown that in cases where such piling is used temporarily it has been used as many as eighty times before being unfit for further use.

The competing paragraphs, except paragraph 1459, are as follows:

PAR. 304. Steel ingots, cogged ingots, blooms, and slabs, by whatever process made; die blocks or blanks; billets and bars, whether solid or hollow; shafting; pressed, sheared, or stamped shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping; hammer molds or swaged steel; gun-barrel molds not in bars; alloys not specially provided for used as substitutes for steel in the manufacture of tools; all descriptions and shapes of dry sand, loam, or iron molded steel castings; sheets and plates and steel not specially provided for; all of the foregoing valued at not over 1 cent per pound, two-tenths of 1 cent per pound; valued above 1 cent and not

above 1½ cents per pound, three-tenths of 1 cent per pound; valued above 1½ and not above 2½ cents per pound, five-tenths of 1 cent per pound; valued above 2½ and not above 3½ cents per pound, eight-tenths of 1 cent per pound; valued above 3½ and not above 5 cents per pound, 1 cent per pound; valued above 5 and not above 8 cents per pound, 1 7/10 cents per pound; valued above 8 and not above 12 cents per pound, 2½ cents per pound; valued above 12 and not above 16 cents per pound, 3½ cents per pound; valued above 16 cents per pound, 20 per centum ad valorem: *Provided,* That on steel circular saw plates there shall be levied, collected, and paid an additional duty of one-fourth of 1 cent per pound.

Par. 312. Beams, girders, joists, angles, channels, car-truck channels, tees, columns, and posts, or parts or sections of columns and posts, deck and bulb beams, and building forms, together with all other structural shapes of iron or steel, not assembled, manufactured, or advanced beyond hammering, rolling, or casting, one-fifth of 1 cent per pound; any of the foregoing machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting, 20 per centum ad valorem; sashes, frames, and building forms, of iron or steel, 25 per centum ad valorem.

We shall first discuss the correctness of the collector's classification of this imported merchandise, under paragraph 304, as steel not specially provided for. As we have before stated, the evidence shows this merchandise to be fully manufactured articles, ready for their ultimate use. They have distinctive names by which they are known in the trade—steel sheet piling and steel corner sheet piling.

Paragraph 304 and its predecessor paragraphs have been before the courts for construction on various occasions. We think a fair reading of these authorities will lead the mind to the conclusion that this paragraph was not intended to apply primarily to fully manufactured articles, such as were ready for their final use, but rather to articles manufactured to a degree, but material for other subsequent manufacturing processes. The language of this paragraph, "sheets and plates and steel not specially provided for," first came under the observation of this court in *United States* v. *Prosser,* 1 Ct. Cust. Appls. 22. The merchandise there involved was ball mill plates, used in grinding mills. The contest was between paragraphs 135 and 193 of the tariff act of July 24, 1897, the former of which provided for "sheets and plates and steel in all forms and shapes not specially provided for," and the latter of which provided for articles or wares of steel not specially provided for. The court held that the articles being fully manufactured, they could not be classified as plates of steel not specially provided for, which words, it was said, "refer to commodities at a lower stage of manufacture."

In *Lunham & Moore* v. *United States,* 2 Ct. Cust. Appls. 1, also under the act of July 24, 1897, the court had before it certain manufactures, such as pitchers, knobs, handles, etc., made of sheet steel.

Referring to the language in paragraph 135 of that act, "pressed, sheared, or stamped shapes," the court said:

A reading of paragraph 135 clearly indicates that pressed, sheared, or stamped shapes of steel and steel in all forms and shapes aptly applies to the plates, forms, and shapes of steel which are the crude material for subsequent manufacture, and not to the forms and shapes they assume, as in this case, which are the results of such manufacture.

In *Newman-Andrew Co.* v. *United States*, 2 Ct. Cust. Appls. 4, certain steel wortles and drawplates were involved. They were classified by the collector as articles or wares of steel, manufactured under said act of 1897, and were claimed to be "plates" or "steel in all forms and shapes," under paragraph 135 thereof. The court held them to be properly classified, quoting with approval the opinion of Judge Hough in *United States* v. *Buehne Steel Wool Co.*, 154 Fed. 93:

It seems to me going *too* far to describe the articles of steel specifically enumerated in paragraph 135 as "crude" or even "simple," for many of them are of complex design and all presuppose great inventive and mechanical skill, and are finished or completed in the sense that they are ready for the markets of the world. But it is true that as a class they are, though the finished products of the mill, *but the raw material for some other metal industry*—for the machine shop or the builder. No article there enumerated is ordinarily used by the final consumer, or put to its ultimate use, by the name or in the shape described by the name used in paragraph 135.

*In re Myers & Co.*, T. D. 38154, 37 Treas. Dec. 117, involved the classification of certain steel car replacers under the tariff act of October 3, 1913. They were classified as manufactures of metal and were claimed to be dutiable as "steel castings" under paragraph 110 of said act, the predecessor paragraph of paragraph 304, now before us. Speaking of the application of said paragraph 110, General Appraiser Fischer, in the opinion filed in the cited case, says:

That paragraph apparently contemplates merchandise which is still in the form of materials out of which articles may be made, rather than complete articles themselves. Thus, provision is therein made for steel bars, shafting, stamped shapes; steel castings, sheets, and plates; steel ingots, blooms, and slabs, rolled wire in coil, and for steel not otherwise specially provided for. There seems to be no provision in said paragraph for articles made from any of the enumerated materials.

In *United States* v. *Downing & Co.*, 14 Ct. Cust. Appls. 194, T. D. 41702, we discussed the language of paragraph 305 of the tariff act of 1922, "steel in all forms and shapes." We there said:

"*Steel* in all forms and shapes" conveys the idea of material, and "by whatever process made, and by whatever name designated, whether cast, hot or cold rolled, forged, stamped, or drawn," would seem to imply that some steel in certain forms and shapes had been subjected to a manufacturing process. We think, however, the last-quoted phrase implies only such a manufacturing process as would leave the product a material for succeeding manufacturing or structural efforts.

While this language is not identical with that found in said paragraph 304, yet it is quite apparent from an examination and comparison of the two paragraphs that similar reasoning might well be applied in this respect to each.

Our conclusion is, based upon the language of paragraph 304 and upon these authorities, that said paragraph was intended to refer to materials for further manufacturing processes and not to completely manufactured products like the steel piling involved here. It follows that the collector erred in classifying it under that paragraph.

If the classification of these goods by the collector is erroneous, has the importer made a proper claim for their classification as "structural shapes of steel" under paragraph 312? The court below found that such claim was meritorious both as a matter of law and of fact. Unless the judgment of the court below is contrary to law or is without evidence to support it or clearly contrary to the weight of the evidence, it should not be disturbed.

The term "structural shape" was thus defined in *Birtwell* v. *Saltonstall*, 39 Fed. 383, as it appeared in a similar provision in Schedule C of the act of March 3, 1883:

It appears from the evidence that, speaking in a broad commercial sense, the term "merchantable iron" is limited to rounds, squares, and flats; that anything else, such as beams, girders, angles, etc., having any special shape, and intended to be used in the form of a structure, is a structural shape.

This question was before this court in *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust. Appls. 273. There various steel channel irons and other unassembled parts of a mash filter had been imported and were classified as manufactured articles under paragraph 167 of the tariff act of October 3, 1913. They were claimed by the importer to be dutiable as structural shapes under paragraph 104 of said act, the predecessor paragraph of paragraph 312, now under consideration here. The court, in sustaining the claim of the importer, said:

No evidence was adduced showing or tending to show that the *eo nomine* designations of paragraph 104 have a meaning in trade and commerce different from that commonly attributed to them by people in general. Neither is there anything in the paragraph or the act which would warrant the conclusion that Congress intended to confine the materials therein provided for to such as are used for buildings, ships, and similar erections. Indeed, the fact that the paragraph provides for many articles which may be and are used in the construction not only of ships and buildings but also in the erecting of such well-recognized structures as bridges, wireless towers, trestles, water towers, derricks, dams, canal locks, and filtration plants, coupled with the fact that it enumerates car-truck channels, a class of materials not designed for use in ships or buildings, convinces us that Congress had in mind more than two kinds of structures when the provision was passed.

The reasoning thus used is equally applicable to said paragraph 312, which contains practically identical language with said paragraph 104, in so far as the *eo nomine* designation of articles therein is concerned. The reenactment of this paragraph in the Tariff Act of 1922, unchanged, under the familiar rule, is indicative that the Congress knew of and concurred in the interpretation thus placed upon this language.

The interpretation thus put upon the term "structural shape" is in harmony with the common and ordinary meaning of the term. Webster's New International Dictionary (1925) thus defines it:

Structural shape. Engin. & arch., the shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, colloq., any steel or iron member of such shape, as channel irons, I beams, T beams, etc., or, sometimes, a column, girder, etc., built up with such members.

A structure is thus defined by the same authority:

Structure. 3. Something constructed or built, as a building, a dam, a bridge; esp., a building of some size; an edifice.

The sheet piling in the case at bar plainly comes within the definition first above given. It is so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures. While much of it is used under ground, lexicographers agree that a structure is not confined to that part of a building which appears above the ground. It is argued that the use of such piling being temporary, it is not a true structural material. Without attempting to foreclose discussion on this point, it is sufficient to suggest that the testimony shows that at least one-half of this piling is permanently installed in structures, where it forms a very essential and necessary part. If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification. It is shown in the case at bar that very considerable quantities of I beams and similar material are used for temporary work. If, as a matter of fact, a major portion of such material was so used, this in itself would not remove it from the classification of structural shapes. It will be observed that paragraph 312 in no way indicates that the use of structural shapes must be permanent and not temporary.

To meet this claim of the importer, the Government in the court below introduced testimony intended to show that in the trade and commerce of the country the imported material had a different designation from its common one and that it was there known and bought and sold not as structural shapes but as steel sheet piling. A number of the witnesses for the Government so testified, substantially. It was also shown that what was admittedly structural shapes, such as I beams and T beams, were also not bought and sold as structural shapes but by their respective names. It was shown

that in ordering all such material, including steel sheet piling, it was necessary to designate the name, style, size, and weight of the same, in order that an order might be filled.

Ordinarily, proof of commercial designation is adduced in the effort to remove an article from a provision where it is *eo nomine* designated to some other tariff designation or to bring it within a designation which would not otherwise include it. But here the attempt is made to remove an article from a generic designation by proof that it is not known by the generic designation but by a specific name differing from the generic designation. Such proof is not ordinarily satisfactory. Naturally, structural shapes would not be ordered and sold in the trade by the general designation of "structural shapes." In *Revillon Frères* v. *United States*, 2 Ct. Cust. Appls. 209, the question arose whether certain pony skins should be classified as furs, dressed on the skin, under paragraph 439 of the tariff act of August 5, 1909, as found by the collector, or as other skins, under paragraph 451 thereof. This court, in holding them to be properly classified, said:

> Quite naturally most, if not all, of the witnesses, both for the Government and for the importers, testified that pony skins were not ordered, bought, and sold as "dressed furs" or as "furs dressed on the skin." At the same time it was made perfectly clear by the testimony that no skins, whether true furs or not, were so ordered, bought, or sold. Such expressions are too indefinite for commercial transactions, and necessarily more specific language must be used by buyer and seller if the one is to understand and the other to secure what is wanted.

The language quoted is quite applicable to the case at bar. An analysis of the evidence in this record leads to the conclusion that for many years sheet steel piling has been bought and sold in the markets of the United States precisely as other structural steel shapes, and that at times some of such other more well-known structural shapes have been used for precisely the same purposes as this sheet piling. In line with the *Revillon Frères* case, this record shows that for years this material has been definitely, uniformly, and generally treated and used by the steel trade as structural shapes, and that prior to the approval of the Tariff Act of 1922 trade usage and custom had so far crystallized as to give to the term "structural shapes," a definite, uniform, and general significance broad enough to include the steel sheet piling in controversy.

The proof of commercial designation is not sufficient, in our judgment, to lead us to conclude that the judgment of the court below on that subject is without evidence to support it or is clearly contrary to the weight of the evidence.

The judgment of the court below is therefore *affirmed*.