(C. D. 1595)

## C. J. TOWER & SONS v. UNITED STATES

United States Customs Court, Second Division

(Decided March 18, 1954)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*William J. Vitale* and *Richard M. Kozinn*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: So-called elevator sills, also described in the record as "feralun sill plates," were classified by the collector of customs as articles of metal in accordance with the provisions of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was assessed thereon at the rate of 22½ per centum ad valorem.

In its original brief filed herein, plaintiff states that—

* * * Although several claims are made in the protest, the one upon which we rely is that the sills in question are properly dutiable at 10% ad valorem under par. 312 of the act as modified by said T. D. 51802, as all other structural shapes of iron or steel, machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting.

The competing provisions of the statutes above referred to, so far as pertinent here, read as follows:

Paragraph 397, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*      \*      \*      \*      \*      \*      \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

Other (except slide fasteners and parts thereof)_____22½% ad val.

Paragraph 312, as modified, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

\*      \*      \*      \*      \*      \*      \*

Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting__10% ad val.

The following illustrative exhibits were offered by the plaintiff and received in evidence:

1—A photograph which "shows the installation of a typical elevator sill in a building," the sill being fastened to the structural steel floor beam "by means of knees or clips bolted to the beam and to one another and to the sill."

2—A drawing illustrating a typical sill plate which "shows the early stage of an installation of a hoistway door sill plate and the door frame assembly in an elevator hoistway. The cast-iron sill plate is fastened with clips to the steel floor beam and it supports the vertical angle iron struts and the formed door header which is used for supporting the door and for supporting a section of the wall installed above the doorway."

3—Showing "a later stage of the installation of the sill plate and door assembly indicating the door buck or the framework which is installed and around which the wall is subsequently built."

4—Illustrating a still later stage "in the installation showing the hollow-tiled wall built around and within the door frame and the doors hung on rolling hangers and in the sill."

5—Another illustration showing "the complete installation of the door frame \* \* \* the doors are shown closed and fascia and hanger cover plates to conceal the rough wall from within the elevator car have been added or are shown in place."

6—Depicting "a typical gearless elevator installation."

The basic facts as to the character, condition, and use of the importation are not disputed. Therefore, the question for our determi-

nation is substantially one of law, namely, whether the subject merchandise should be classified as structural shapes, as claimed by plaintiff. Otherwise, it is an article wholly or in chief value of metal, as classified by the collector.

At the trial, the following three witnesses were called, each of whom testified on behalf of the plaintiff.

Percy Foster, office manager in charge of the works accounting and foundry costs with the Otis Elevator Co., Ltd., of Hamilton, Ontario, had been employed by that company for 30 years. He testified to his familiarity with the imported merchandise from having seen it produced by his company. He explained the process of manufacture as follows:

On feralun sills we receive an order from the Harrison works, U. S. A., together with a drawing. A pattern is made from this drawing, sent into our foundry.

\* \* \* \* \* \* \*

A wood pattern, from which a casting is made, a sill plate casting. This casting goes to our foundry and is foundry finished, then sent into the machine shop for final processing, machining, which would be in the nature of planing, drilling, and finally painted and then shipped.

He stated that iron is used in producing these castings and that feralun is the abrasive which is used in the casting process to give the product a "non-slip" quality.

Further, the witness testified—

After the casting is completed it is what we term dry-finished, that is the gates and risers are ground off. And this is then sent into our machine shop. It is planed for grooves and a number of holes are drilled according to the drawing. And then it is sent to the paint shop, painted ready for shipment.

The second witness, Philip Karmel, testified that he is the supervising mechanical engineer in the executive offices in charge of the design of doors, door equipment, door operators, and door interlocks, for elevators, with the Otis Elevator Co., in New York, which is engaged in the manufacture and installation of elevators. He had graduated from New York University in 1920 as a bachelor of science in mechanical engineering; was employed in 1920 by the Elevator Supplies Co. in Hoboken, N. J., as a draftsman and engineer; in 1923, he was employed by the Graham & Norton Co., manufacturer of elevator equipment; and, since 1929, has been in the employ of the Otis Elevator Co.; that the business of the Elevator Supplies Co. "was elevator accessories, signal systems and door operations." As a licensed engineer whose work has been largely in connection with doors, door devices, door operators, and electrical interlocks, for elevator doors, he had gained an intimate knowledge of all phases of elevator manufacture and operation.

Karmel stated that he was familiar with the type of sill plates in controversy here, having been in charge of designing sill plates for his company for many years; that the sill plates at bar were designed under his supervision; and that they were installed in the East Cleveland Public Library, Fidelity Bank & Trust Co., Houston, Tex., the Edificio Pesquera in San Juan, Puerto Rico, and various buildings in other cities.

Karmel described a sill plate as—

* * * a part of a hoistway door assembly used at the entrance-way to an elevator at each landing. It's a cast iron plate properly designed with grooves to guide the sliding hoistway doors, the bottom of the sliding hoistway doors. And it's fastened to the building structural steel and supports the struts and the buck and the header, the door hangers and the doors, which go to make up this assembly.

It was explained by the witness that the sill plates are not in the elevator car itself, "they are on the hoistway landings"; that they weigh from 125 to 130 pounds each, and are fabricated, designed, and "dimensioned" for each particular installation.

Karmel testified that exhibit 1 illustrates the installation of a typical elevator sill in a building. "It shows the sill in place and fastened to the structural steel floor beam by means of knees or clips bolted to the beam and to one another and to the sill in this particular case. * * * It is to guide the doors and to support the door frame and the door assembly and also to serve as a non-slip surface for the passengers as they enter or leave the elevator."

With respect to exhibit 2, Karmel testified that—

* * * it shows the early stage of an installation of a hoistway door sill plate and the door frame assembly in an elevator hoistway. The cast iron sill plate is fastened with clips to the steel floor beam and it supports the vertical angle iron struts and the formed door header which is used for supporting the door and for supporting a section of the wall installed above the doorway.

When asked to explain why the elevator sill plates are essential to the proper operation of an elevator, the witness stated—

Well, the sill is used to support the door frame to guide the doors and it's very carefully set in relation to the elevator guide rails for alignment with the elevator because the door frame and the sill support door closers or operating devices or power operators and interlocks which are frequently operated from apparatus or devices carried by the elevator car. So that in order to assure alignment between the sill and the door frame and these devices the sill and door frame are set in proper relation to the guide rails.

Q. And what function is performed by the grooves in the sill plate?—A. Well, the hoistway doors are sliding doors, moving horizontally, and they are equipped with small guide blocks which project down below the bottom of the door into the groove in this sill plate so that the groove guides the bottom edge of the door.

Karmel was asked whether a contract for the installation of an elevator by the Otis company included sill plates, to which he replied—

"in the normal course of our business the sill plate and hoistway door assembly is part of our contract." As a practicing engineer of many years' experience, Karmel expressed the opinion that sill plates like those in controversy are structural shapes "Because they are used as part of the door assembly in the building structure to support the door frame and the doors and a portion of the wall." The witness stated that one of the doors would weigh 125 to 150 pounds; that the sill plates also sustain the angle struts, weighing approximately 15 pounds; the door header another 50 pounds; and the weight of the wall above the door header in the neighborhood of 200 pounds.

When asked if the sill plates are designed to carry building load or stress in whole or in part and if they are adapted to give the greatest strength with the least material, he answered in the affirmative.

On cross-examination, Karmel stated that these sill plates "are a stationary part of the elevator installation."

He testified further on cross-examination:

X Q. Of course, the sill plate is embedded in the floor, is it not?—A. Well, the floor is poured around it and under it.

X Q. And what holds the floor?—A. The floor itself is generally poured concrete, resting on forms when it is poured, and supported by the floor beams.

X Q. And that tends to support the sill plate, the frame, the header, the wall above it, and everything else above it, is that right?—A. Well, the sill plate is fastened directly to the floor beam which supports the sill plate. The floor beam also supports the floor.

X Q. And the floor supports also the sill plate to some extent, does it not?—A. Well, it is poured around it so it holds it firm, but the supports, the steel supports which go down to the floor beam are the essential support of the sill plate.

X Q. The floor beam?—A. The floor beam.

X Q. And it is the floor beam which supports, then, the sill plate, the door, the angle struts, the door and the wall above it, is that right?—A. Oh, yes.

The third witness, Carroll H. Fleming, stated that he was sales engineer of the Buffalo zone office of the Otis Elevator Co., with which he had been identified for about 26 years, and that he had studied engineering at the United States Naval Academy, from which he graduated in 1919. He testified that he had been familiar with sill plates of the kind under consideration here for more than 20 years and of the part they play in the operation of an elevator. His testimony was in substance like that of the witness Karmel.

In support of its contention that the sill plates in controversy are structural shapes, plaintiff cites the case of *The Frost Railway Supply Co.* v. *United States*, 39 C. C. P. A. (Customs) 90, C. A. D. 469, in which the court reviewed various decisions involving the interpretation of the provision for structural shapes, special attention being

given to the following cases wherein various articles were held to be structural shapes:

*Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537—steel channel irons, steel bars or grates, and frames, plates, center pieces, posts, and heads or end pieces of cast iron, materials ready to be assembled as parts of a mash filter, the court stating that the words "structural shapes" imply in general a capacity to sustain heavy weights or to resist great tension or both.

*United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184—certain steel sheet piling, used in foundation work in buildings.

*United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079—deformed steel bars for reinforcing concrete.

*Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038—certain angles used in erecting structures.

In the *Frost* case, *supra*, the court also referred to some decisions in which certain articles had been denied classification as structural shapes, citing *Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T. D. 40490, the subject merchandise being connecting rods for locomotive drive wheels; *E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240—universal mill plates were regarded by the court as mere material for use in making structural shapes; *Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449, T. D. 44700—checkered, or raised diamond, steel floor plates chiefly used as flooring in buildings; *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225—wire netting for holding stucco on the sides of buildings; and *Otis McAllister & Co.* v. *United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52—galvanized, corrugated iron sheets which formed the walls and roofs of certain buildings, the court declaring that the sheets themselves are not designed to carry a building load or stress.

The *Frost* case, *supra*, is authority for the statement by the court that—"No precise definition * * * can be laid down to cover the term [structural shapes], each case depending on its own record for determination." It is interesting to note that in the *Exstein* case, *supra*, certain deformed steel bars used for the reinforcement of articles made of concrete which the collector of customs classified as steel bars in paragraph 304 of the Tariff Act of 1922 were held properly classifiable as structural shapes in paragraph 312 of that act. The court apparently regarded that as a borderline case, as indicated by the following quotation from its opinion:

* * * It is true, the present case presents for consideration an importation which might be considered upon the border line between material, such as we have held is covered by said paragraph 304, *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, and structural shapes, as provided for by said paragraph

312. Applying the principles, however, stated in the last cited case as well as in *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, there does not seem to be any inherent difficulty in arriving at a satisfactory conclusion.

It appears further from the opinion in the *Exstein* case, *supra*, that the deformed bars in controversy were—

\* \* \* used in all buildings of steel construction, wherever concrete work is needed, and are also used as a reinforcement in concrete buildings or structures where no steel framework is used. The bending of the ends for attachment to the other members of the building is done by workmen, usually in the progress of construction; when this material is imported it is straight, without any such finishing. When a structure in which such material is used is completed, the said material assists in carrying both the dead and live loads of the building, has the capacity to resist great tension and compression, contributes to the stability of the structure, and becomes an integral part of the skeleton of the same. \* \* \*

The latest expression of our appellate court upon this subject is contained in the case of *United States* v. *Winkler-Koch Engineering Co.*, 41 C. C. P. A. (Customs) 121, C. A. D. 540, wherein, after a very searching analysis of all the cases on the subject of structural shapes, beginning with the decision in *Simon, Buhler & Baumann, supra*, it was there held that certain steel casings for use in constructing oil wells were properly classifiable as structural shapes.

Flowing through all of these decisions and others that may be cited is the guiding principle that the defining characteristics of structural shapes are the capacity to sustain heavy weights or to resist great tension, or both, and to combine the greatest strength with the least weight. However, this is not all. It is necessary that in addition to those characteristics a structural shape must be "a member especially adapted to structural purposes." In other words, it must be used in erecting structures. *United States* v. *Frank, supra.* In that case, the dutiable classification of steel pilings was at issue. In holding such pilings to be structural shapes, the court, after referring with obvious approval to its decision in the *Simon, Buhler & Baumann* case, *supra*, gave expression to the following statement:

The interpretation thus put upon the term "structural shape" is in harmony with the common and ordinary meaning of the term. Webster's New International Dictionary (1925) thus defines it:

Structural shape. Engin. & arch., the shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, colloq., any steel or iron member of such shape, as channel irons, I beams, T beams, etc., or, sometimes, a column, girder, etc., built up with such members.

A structure is thus defined by the same authority:

Structure. 3. Something constructed or built, as a building, a dam, a bridge; esp., a building of some size; an edifice.

The sheet piling in the case at bar plainly comes within the definition first above given. It is so made as to combine the greatest strength with the least weight and is *exclusively used in erecting structures.* [Italics supplied.]

It is the contention of plaintiff, based upon the record, that "Measured by those tests the elevator sills in question are clearly structural shapes."

With equal assurance the defendant in support of its contention that these sill plates are not structural shapes also relies upon many of the cases cited by plaintiff and, in addition, refers to *Birtwell* v. *Saltonstall*, 39 Fed. 383; *Morgan & Wright et al.* v. *United States*, 36 Treas. Dec. 359, T. D. 37989; *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851; and *The Winkler-Koch Engineering Company* v. *United States*, 30 Cust. Ct. 26, C. D. 1494.

Upon careful analysis of the cited cases, we are persuaded that the weight of competent authority compels the conclusion that the subject merchandise is not "structural shapes," as contemplated by said paragraph 312.

Granting *arguendo* that these sill plates afford the greatest strength with the least material, that is not enough to meet the definition of structural shapes, inasmuch as they do not, in our opinion, carry building loads or stresses in their capacity as sill plates. At the most, said articles are but part of an elevator installation being that particular part of a hoistway door assembly used at the entranceway to an elevator at landing points. They do not, in our opinion, become a part of the framework of a structure or a building but are more properly to be regarded as accessories or equipment to complete the interior of a building to enable it to function satisfactorily after it is constructed. As a matter of fact, plaintiff's witness, Karmel, testified that when these sill plates are installed or embedded in a floor, concrete is poured around them, or as stated by the witness—"The floor itself is generally poured concrete, resting on forms when it is poured, and supported by the floor beam. * * * the sill plate is fastened directly to the floor beam which supports the sill plate. The floor beam also supports the floor. * * * the steel supports which go down to the floor beam are the essential support of the sill plate."

When asked if the floor beam supports the sill plate, the door, the angle struts, and the wall above it, the witness replied "Oh, yes."

Upon a careful review of the record and the various authorities cited by the parties, we find and hold that the sill plates in controversy are not structural shapes within the contemplation of paragraph 312, *supra*, as claimed by plaintiff, and since our attention has not been directed to any more specific provision, we hold that they were properly classified by the collector of customs as articles or wares, not specially provided for, whether partly or wholly manufactured, wholly or in chief value of steel, and dutiable accordingly. The protest is, therefore, overruled.

Judgment will be entered accordingly.