BEFORE THE SECOND DIVISION, APRIL 8, 1954

**No. 57983.**—Commercial Steel, Inc., and Edward S. Zerwekh Co. *v.* United States, protest 184076–K (Los Angeles).

FORD, Judge:  The merchandise involved in this case was invoiced as "6″ x 6′″ Mesh of No. 10 ASWG wires.  612 rolls 200′ x 7′ 856,800 square feet" and "6′″ x 6″ Mesh of No. 6 ASWG wires.  34 rolls 200′ x 7′ 47,600 square feet."  The collector of customs classified this merchandise as manufactures of metal, not specially provided for, under the provisions of paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and levied duty thereon at the rate of 22½ percent ad valorem.

Plaintiffs claim said merchandise to be properly dutiable at only 10 percent ad valorem under paragraph 312 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, as structural shapes of steel, machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting.  By amendment, the merchandise is also claimed to be dutiable at only ⅛ cent per pound under the same paragraph, as modified, as structural shapes of steel, not assembled, manufactured or advanced beyond hammering, rolling, or casting.

At the trial, a sample of the merchandise was admitted in evidence and marked illustrative exhibit 1, and one witness testified for the plaintiffs, in substance, as follows:

That he had been associated with the Commercial Steel Co. for about 2½ years; that the business of said company was buying and selling steel products, such as nails, reinforcing steel, and bolts; that the meaning of the letters ASWG is American Standard Wire Gauge; that the No. 6 and No. 10 on the invoice indicate the gauge of the wire; that the length and width of the involved wire was 200 feet by 7 feet; that the involved merchandise is 6-inch mesh, but "It is made in 2'', 4'', 6'' meshes, and it is made in 4-gauge and 6-gauge and 10-gauge wires"; that the pieces of wire are held together to form the mesh by being welded at the points where they meet or cross.

The witness also testified that he had seen the involved wire used in residential house tracts, or just about any residential structure that has a driveway. When asked how he had seen the merchandise used, he stated:

Well, the ground is prepared. A trench, may be 2 or 3 inches deep, is excavated in the area that the cement is to be poured into, and then this wire is unrolled, and it is supported about an inch, 2 inches above the ground by little stakes, at maybe every 10 feet. So that when the cement is poured the cement goes over it and under it, and it becomes a support to the cement.

Q. Does the exhibit then become a part or integral part of that slab?—A. That is right.

*      *      *      *      *      *      *

Q. What is the purpose of using Exhibit 1 in the manner you have described?— A. For reinforcement for the concrete.

The witness also testified that different size wire is used for different work or different jobs, depending on the stress and strain the concrete is going to have to take in its natural use; that he had seen reinforcing steel used to reinforce concrete, varying in size from a quarter inch smooth bar, to an inch and a quarter deformed bar, depending on the strength the concrete is to have. In describing the use of the merchandise in the construction of a driveway, 14 by 50 feet, the witness stated that the trench would be excavated to the depth of the thickness of the slab desired:

And then the mesh would be rolled out its full length of the slab. We will say it was 50 feet, it would be rolled out 50 feet, and by its own width would cover half of the 14 feet. It would be cut at the end of the 50-foot length, and then it would be rolled back alongside, but overlapping maybe 6 inches or to a foot; and those overlapping places would be tied.

The witness also testified that the involved wire was used in the construction of swimming pools and septic tanks in a manner quite similar to its use in the construction of driveways; that he had also seen it used in the construction of cement slabs to be used as floors in buildings; that he had seen it used in the construction of overpasses for pedestrians, "for the steps and just below the steps, where it joins onto the solid ground. * * * Such as we have in the Los Angeles Freeway—just like an automobile overpass; only it is smaller; requires less stress and strain."

The witness described the use of the merchandise in conjunction with smooth or deformed bars as follows:

Any of the small houses that have a slab on the floor, for all the porches and places where the concrete will be joined to the slab, in order to make the bond better they use a bar to extend through the slab that is reinforced by the wire mesh to the slab, that will be reinforced by steel. In other words, where the steps are joined the steps are too small to work the wire, well, they will work the bars.

*      *      *      *      *      *      *

Well, the deformed bars would be used, as I said before, for tying in the porches or steps, where the mesh is too big and bulky to run out, and the smooth bar would be used the same way as the mesh. See, the reinforcing bar comes in size from quarter to inch and a quarter, but the deformations start only on ⅜. Hence the quarter-inch is smooth, just like the wire, and they would use the quarter if they only had to run over—if the dimensions of the slab were just a little awkward, they would supplement the mesh with steel, rather than cut a roll down to a small strip.

The witness further stated that he had seen floors of buildings constructed without this type of mesh.

It should be observed that all the testimony of the witness was as to uses of the merchandise which he had personally observed. It is significant to note that the witness, not being an engineer, was not qualified to give testimony regarding the capacity of the involved merchandise to sustain heavy weights or to resist great tension or both. Consequently, there is no evidence in the record on that point.

In *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225, the Court of Customs and Patent Appeals, in holding wire netting not to be structural shapes, said:

\* \* \* We do not think the wire netting is a structural shape within the meaning of the provision in the paragraph relied upon by appellant. We do not regard it as being designed for such a use, or being capable of such a use as is indicated by the language in the paragraph for the structural shapes therein provided for. It is not designed to support any portion of the weight of the building except the outside stuccoed portion, and to hold that the wire which holds the stucco to the wall is a structural steel shape would, inevitably, lead us far afield. If deformed steel bars are on the border line, wire netting, we think, would be entirely beyond the border line. If steel-wire netting was to be regarded as a structural shape within the meaning of the paragraph, for the reasons contended for by appellant, it would be very difficult to differentiate between this class of merchandise and many other articles of iron or steel which go into the making of a building or structure, which clearly Congress did not contemplate as falling within the provision.

In *Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449, T. D. 44700, this court, following the *Simon, Buhler & Baumann* case, *supra*; the *Henry L. Exstein Co.* case, *supra*; the *Frank* case, *supra*; and *Birtwell* v. *Saltonstall*, *supra*, held that steel plates, 30 to 60 feet in length, and 4 feet wide, with raised diamond-shaped projections on one side, chiefly used as flooring for boiler rooms, engine rooms, etc., were not structural shapes.

\*   \*   \*   \*   \*   \*   \*

Appellant has complained of the fact that in the lower court the position was taken that the merchandise "lacks the inherent characteristics of such a shape and is certainly not *ejusdem generis* with the articles so designated in the law" and makes reference to the doctrine of *noscitur a sociis.*

This court has, on one occasion, at least, attempted to indicate a slight difference in the application of the two doctrines which it is not necessary to discuss here. *United States* v. *Imperial Wall Paper Co.*, 14 Ct. Cust. Appls. 280, T. D. 41886. We think the application of the rule of *ejusdem generis* to the issues in this case is proper.

\*   \*   \*   \*   \*   \*   \*

In construing the general provision, "all other structural shapes of iron or steel," etc., we think it eminently proper to consider the question as to whether the article sought to be included within its terms are of the same kind, class or nature as the articles specifically named in the paragraph, such as "beams, girders, joists," etc.

This rule of interpretation is not to be regarded as controlling in all instances, *United States* v. *R. F. Downing & Co.*, 17 C. C. P. A. (Customs) 194, T. D. 43645, but it may be controlling where the proper construction of a tariff paragraph is in doubt and where the intent of the legislature is not otherwise more persuasively indicated. *United States* v. *Imperial Wall Paper Co., supra.*

We do not think the wire netting at bar is of the same class or nature as the articles specifically named, and this fact is at least one of the considerations which brings us to the conclusion that it should not be classified under paragraph 312.

Furthermore, there is nothing in the legislative history connected with paragraph 312 or its predecessors to indicate that it should be given the construction contended for by appellant. If any importance is to be attached to the legislative history, it would point in the opposite direction.

With equal force, we feel it might be said here, that if deformed steel bars are on the borderline, wire mesh, such as is involved here, would be entirely beyond the borderline. We do not think that the wire mesh at bar is of the same class or nature as the articles specifically named in paragraph 312.

Plaintiffs, in their brief filed herein, cite and rely to some extent upon the case of *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079. In that case, the Court of Customs Appeals held bars, made from new billet steel, in part, approximately 1⅛ inches square and 60 feet in length, and three-eighths and one-half inch in diameter, rolled and conforming to the standards established by the American Society for Testing Materials, upon the surfaces of which were ridges and protuberances so placed and spaced as to make them suitable for holding when embedded in concrete construction, to be structural shapes of iron or steel. However, in the course of its decision, the court stated:

\* \* \* It is true, the present case presents for consideration an importation which might be considered upon the border line between material such as we have held is covered by said paragraph 304, *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, and structural shapes, as provided for by said paragraph 312.

In *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, in holding steel sheet piling to be structural shapes, the Court of Customs Appeals also observed that:

\* \* \* In line with the *Revillon Frères* case, this record shows that for years this material has been definitely, uniformly, and generally treated and used by the steel trade as structural shapes, and that prior to the approval of the Tariff Act of 1922 trade usage and custom had so far crystallized as to give to the term "structural shapes," a definite, uniform, and general significance broad enough to include the steel sheet piling in controversy.

It is clear from an examination of the testimony in this case that it fails to establish that in the past this material has been definitely, uniformly, and generally treated and used by the steel trade as structural shapes, and that prior to the approval of the Tariff Act of 1930 trade usage and custom had so far crystalized as to give to the term "structural shapes," a definite, uniform, and general significance broad enough to include the steel wire mesh here involved.

In *United States* v. *Julius Blum & Co., Inc.*, 26 C. C. P. A. (Customs) 168, C. A. D. 12, the Court of Customs and Patent Appeals disapproved the rule of chief use for the purpose of determining the scope of the provisions of paragraph 312, in the following language:

\* \* \* Furthermore, in our decision in that case, we expressly disapproved of that part of the trial court's decision holding that the "doctrine of chief use" should be "applied for the purpose of determining the scope of the provisions of paragraph 312."

Obviously, if the doctrine of chief use is applicable at all it is controlling, and all shapes of iron or steel not "assembled, manufactured, or advanced beyond hammering, rolling, or casting," chiefly used in the construction of buildings, bridges, etc., are, regardless of their character, dutiable under the first part of paragraph 312, *supra*. Such a construction of the provisions in question, with the attending results, plainly was not within the contemplation of the Congress.

The character of the involved articles, together with the uses for which they were designed and to which they are put, should be considered in determining their dutiable status. *United States* v. *Henry L. Exstein Co., Inc., supra*; *Judson Freight Forwarding Co.* v. *United States, supra*. The "doctrine of chief use," however, has no application to the issues in the case.

In the case of *E. L. Soule & Co.* v. *United States, supra*, steel plates, known as universal mill plates, designed for use and *chiefly used* for structural purposes in buildings and other structures, being mere "material for making shapes and forms," were held not to be structural shapes or "parts or sections of columns or posts" within the purview of paragraph 312 of the Tariff Act of 1922.

In view of the fact that in the instant case the trial court erroneously applied the "doctrine of chief use," and failed to express its views as to the application of the evidence to the issues presented as herein defined, we find it necessary to reverse the judgment and remand the cause for further consideration.

The evidence offered by the plaintiffs is directed almost exclusively to the uses which the witness had personally observed. This, of course, involves the doctrine of chief use, which, in the *Blum* case, *supra*, the Court of Customs Appeals held "has no application to the issues in the case."

For the reasons stated, and following the authorities cited and quoted, we must hold that the evidence offered by the plaintiffs is not sufficient to overcome the presumption or correctness attaching to the action of the collector in classifying the involved merchandise as manufactures of metal, not specially provided for, or to establish any of the claims made by the plaintiffs. All claims of the plaintiffs are, therefore, overruled. Judgment will be rendered accordingly.