(C.D. 2319)

UNIVERSAL BUILDERS SUPPLY CO., INC. *v.* UNITED STATES

---

[15] T.D. 54212, vol. 91, Treasury Decisions, p. 351, at p. 354, recital in par. 1.

[16] *Carl Zeiss, Inc.* v. *U.S.*, 23 CCPA 7, TD 47654, 76 F. 2d 412; *The Best Foods, Inc.* v. *U.S.*, 39 CCR 305, CD 1945, aff'd in *United States* v. *The Best Foods, Inc.*, 47 CCPA 163, CAD 751, 158 F. Supp. 583. Compare *U.S.* v. *Schmidt Pritchard & Co.*, 47 CCPA 152, CAD 750, aff'g 41 CCR 108, CD 2029, cert. den., 364 US 919, 5 L. ed. (2d) 259, 81 S. Ct. 283.

United States Customs Court, Second Division

(Decided February 27, 1962)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* and *David Serko* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Henry J. O'Neill* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Certain merchandise, described on the invoice accompanying the entry covered by the above-enumerated protest as "Latticed form supports" and "Solid form supports," upon importation into the United States at the port of New York were classified by the collector of customs as articles or wares not specially provided for, composed wholly or in chief value of base metal, in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and were assessed with duty at the rate of 22½ per centum ad valorem.

It is the contention of plaintiff herein that said articles should properly have been classified within the provisions of paragraph 312 of said act (19 U.S.C. § 1001, par. 312), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, providing *eo nomine* for beams, girders, joists, and so forth, and for other structural shapes of iron or steel which, when advanced beyond hammering, rolling, or casting, are subject to duty at the rate of 7½ per centum ad valorem.

The pertinent provisions of the statute are here set forth:

Paragraph 397 of the Tariff Act of 1930, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*          \*          \*          \*          \*          \*          \*

   Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

      Woven wire fencing \* \* \*

\*          \*          \*          \*          \*          \*          \*

      Other \* \* \*_____ 22½% ad val.

Paragraph 312 of said act, as modified, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

      Not assembled, manufactured or advanced beyond hammering, rolling, or casting_____ 0.1¢ per lb.

      Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting\_\_\_\_ 7½% ad val.

At the trial of this case, the testimony of six highly qualified witnesses was offered on behalf of the plaintiff, and the following plaintiff's exhibits were received in evidence:

Exhibit 1—a miniature model of a lattice form support.

Exhibit 2—a miniature model of a solid form support.

Exhibits 1–A through 1–F and 2–A through 2–E, inclusive, identify the various components which are used in the fabrication of exhibits 1 and 2.

Exhibit 4—photograph showing the use of exhibits 1 and 2 in the construction of the new Chase-Manhattan Building in New York City.

Exhibit 5—photograph illustrating the use of exhibits 1 and 2 in the construction of a roadway on the George Washington Bridge in New York City.

Exhibit 6—a diagram illustrating the shape of the structural shapes which are used in the fabrication of exhibits 1 and 2 during the course of the rolling process.

Exhibit 8—a photograph illustrating the test procedures performed on exhibits 1 and 2.

There was also received in evidence defendant's exhibit A, consisting of a catalog of the Spanall of the Americas, Inc., showing the use of exhibits 1 and 2.

From the testimony of plaintiff's witnesses, which was not rebutted, the following facts appear. The lattice form supports, of which exhibit 1 is representative, come in lengths of 4′2″, 8′4″ and 11′8″, and the solid form supports in lengths of 6′8″, 8′4″, and 9′11″.

A lattice form support is made up of the following:

A top shape which is cold-rolled out of a steel sheet (exhibit 1–A),

The lattice elements or diagonals (exhibit 1–B) are bent out of round mild steel which was hot-rolled.

A lower flange (exhibit 1–C) is also bent out of round high tensile steel which had been hot-rolled.

The part represented by exhibit 1–D is first hot-rolled, then heated again, and forged into shape by pressure.

At each end of exhibit 1 is a "bridge" (exhibit 1–E) which is also hot-rolled and then forged into a shape. In each bridge is one screw.

Exhibit 1–F consists of two bearing sheets or bearing pieces, which are pressed out of a hot-rolled steel sheet. Said exhibit 1–F is first rolled and then shaped by pressure.

A solid form support, which is represented by exhibit 2, is composed of the following:

A top flange (exhibit 2–A) is cold-rolled out of hot-rolled sheet steel.

A plate (exhibit 2–B) which is a usual hot-rolled steel shape.

Two angles (exhibit 2–C), which are on either side of the bottom portion of exhibit 2, are hot-rolled.

A support piece (exhibit 2–D) is forged out of a hot-rolled shape.

Two end portions (exhibit 2–E), which extend in a vertical direction, are also pressed out of a hot-rolled steel sheet.

Each of the various components above referred to, which make up exhibits 1 and 2, are in themselves structural shapes, having been produced from rolled steel and designed to support a maximum load with a minimum amount of material.

Exhibits 1 and 2 can be used separately or in combinations of one or more lattice form supports with one or more solid form supports. Said exhibits 1 and 2 either in a combined condition or singly have to be bolted or attached to a portion of the structure with which they are used, and the design and purpose of said articles are to support a maximum weight with a minimum amount of material. Exhibits 1 and 2 will carry 44 times their own weight.

It was the testimony of plaintiff's witnesses that exhibits 1 and 2 have been used in every type of reinforced concrete building in the United States where a framework is required to support another structure which is to be superimposed upon it. As examples, reference was made to the Chase-Manhattan Building at William and Cedar Streets in New York City, and the George Washington Bridge, also in New York City, representations of which are contained in exhibits 4 and 5. With reference to the George Washington Bridge construction, lattice and solid form supports were used to give strength to the roadway being built. Said articles serve to support manpower, power buggies, and materials to be used in the construction work. Another instance of the use of exhibits 1 and 2 was in the construction of

the Union Carbide Building in New York City, where construction was performed over a network of railroad tracks. In this case, the substructure in which the lattice form supports and solid form supports were used served to protect the equipment and workmen and provided for the safety of the public who would be underneath.

Various tests of the imported merchandise were made to determine its practicability for structural purposes. Witness Ward, who performed these tests, explained that they were of three general categories—a bending test, a shear test, and an impact test. The bending test, as its name implies, was to determine the bending strength of exhibits 1 and 2. The shear test was to determine the shear strength of the articles. And the impact test was to determine the resistance of the lattice and solid form supports when they are subjected to an impact loading. The result of the bending test was that exhibits 1 and 2 more than exceeded the normal standards required in structural engineering. The shear test disclosed that the articles conformed to the normal structural engineering standards. And the result of the impact test was very favorable, compared with the standard accepted practice. It was the overall conclusion of witness Ward that exhibits 1 and 2 are sound structural members and are properly designed for the purpose they serve. He stated that they possess at least twice the strength of the load that would be imposed upon them in use and that the deflection of exhibits 1 and 2 is such that it will come to the horizontal under the anticipated loading.

It was stated that the prime purpose of exhibits 1 and 2 was to support vertical live and dead loads and that said articles conform to the standard understanding of the terms I-beams, joists, or trusses. The explanation was given that a structure is made up of two elements, columns and beams. A beam may be termed a joist, bar joist, a girder, a roll beam, a jar beam, or by other designation. Any structural member, which is subject to bending by the load applied to it as well as its own weight, is a beam. The other principal element of a structure is a column, the purpose of which is to support a direct stress rather than a bending stress. Within the concept of the foregoing description, the witnesses generally described exhibits 1 and 2, whether used separately or in combination, as a beam.

The record discloses that the use of exhibits 1 and 2 can be either permanent or temporary but that, generally speaking, in the erection of large structures, exhibits 1 and 2 are removed after the building is completed and are reused in the construction of other buildings. Instances where exhibits 1 and 2 would be used as permanent members of a structure are in the construction of a garage, or to shore up a sagging floor, or to support a ceiling from collapsing.

From the issue drawn and upon the facts presented, the court is called upon to determine the following questions:

1. Are the lattice form supports and solid form supports in issue within the *eo nomine* provisions or the catchall provision of paragraph 312 of the tariff act, as modified, *supra*, for structural shapes?

2. If so, have the imported articles been advanced beyond hammering, rolling, or casting?

At the outset, the question of what constitutes a structural shape has been the subject of much litigation in this court and our appellate court, and it has been stated that no precise definition can be laid down to cover the term. *The Frost Railway Supply Co.* v. *United States*, 39 C.C.P.A. (Customs) 90, C.A.D. 469.

In *United States* v. *Humble Oil & Refining Co., Leslie B. Canion, et al.,* 46 C.C.P.A (Customs) 138, C.A.D. 717, it was stated:

* * * Whether a particular article falls within the meaning of that term [structural shapes] must be determined on the basis of the particular circumstances of the case under consideration, including the purpose for and manner in which the article is used, as well as whether or not it forms a part of a structure.

Applying the broad tests above set forth to the instant importation, we find from the record in this case that the lattice form supports and solid form supports were designed and produced solely for structural purposes. It appears, further, that the imported articles, which possess the characteristic of supporting heavy loads with a minimum of material, are used principally in the construction of large buildings, bridges, and other structures, and serve to carry the weight of manpower, supplies, and equipment used in the laying of concrete floors in such structures. From the testimony presented in this case, it appears also that, during the period of their use, the lattice form supports and solid form supports perform the essential structural function of supporting the building in which they are used.

In view of the facts before the court, we are of the opinion that the articles in issue, although not *eo nomine* provided for as lattice form supports and solid form supports in paragraph 312 of the Tariff Act of 1930, as modified, *supra*, are in the nature of beams which are specifically enumerated. In any event, they come within the broad provision in said paragraph for "all other structural shapes of iron or steel."

Defendant, in its brief, attempts to negate the claim of plaintiff for classification of the imported articles within the structural shapes provision of the tariff act, on the ground that the use of the lattice form supports and solid form supports is usually of a temporary and not of a permanent nature. In support of its position, defendant relies on the case of *Hartmann, Duncan & Rogow, Inc.* v. *United States*, 49 Treas. Dec. 1169, Abstract 51465, wherein certain metal forms for

concrete construction were denied classification as building forms in paragraph 312 of the Tariff Act of 1922. The following is quoted from the decision in full in the *Hartmann* case:

The proof shows that it is a patented device which is used all over the United States in the building of concrete floors. According to the testimony of one of the inventors, this device "is set on wood framing, and serves as a steel arch on which the concrete is poured and forms, helps to form a concrete post, and after the concrete is set about two days we remove it and use it in the floors up above, and when that building is finished we ship it to some other job, to the next job. It is used for floor construction only."

The witness further testified:

Q. In this particular importation, do you know whether this imported merchandise or mould remained in the buildings or was taken out afterwards?— A. These particular ones were taken out and used in the next building.

Q. So it is not a permanent part of the building?—A. No, sir.

Q. When they served that purpose you took them out?—A. Yes, sir.

It will be observed that the various articles enumerated in paragraph 312 have this feature in common, to wit, each of them is a well known structural and permanent part of a building. We believe that the paragraph contemplates only such articles, and that the expression "building forms" was intended to cover the unenumerated forms, of iron or steel, which like beams, girders, joists, etc. are permanent structural parts of buildings. The fact that these forms are intended to be used on various buildings would seem to place them in the same category with scaffolding, tools, implements, apparatus, etc. which are similarly transported from building to building as articles necessarily used in the construction of buildings but not permanently employed as structural parts thereof. We do not consider such articles as within the intent of the paragraph.

We do not consider the *Hartmann* case, *supra*, to be controlling of the instant controversy. In the first place, the court, in the *Hartmann* case, had before it for determination whether certain articles were encompassed by the provision for "building forms" in paragraph 312 of the Tariff Act of 1922, which provision does not appear in the Tariff Act of 1930 with which we are concerned. Moreover, our appellate court, in the case of *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T.D. 42184, has held that the mere fact of temporary use will not preclude classification of an article from the structural shape provision of the tariff act.

In the *Frank* case, *supra*, in affirming the decision of the court below which held that certain steel sheet piling, with fabricated steel corner pieces, were structural shapes within the purview of paragraph 312 of the Tariff Act of 1922, the appellate court stated as follows:

The various witnesses who testified were, in the main, well qualified to speak of the uses of steel sheet piling. From their testimony it appears that such material is commonly used in the construction of dams, including core walls after installation, for building foundation work, including retaining walls and foundation piers, for dock walls, for elevator shafts, and for breakwaters. In using the piling in foundation work for buildings, it is shown that the piling is usually driven on both sides of the space intended for the foundation, the earth is then removed, and the space thus left is filled with concrete. When so used, it appears that the steel piling is usually not afterwards removed, and

remains as a reinforcement of the concrete structure. It is also sometimes embedded in concrete and thus forms a part of the foundation. As examples of structures where such piling was so permanently installed, the Marshall Field Building in Chicago, the Astor House, Woolworth Building, and New York Tribune Building, in New York, two school buildings at Cleveland, Ohio, and many breakwaters, retaining walls, levees, tunnels, docks, dams, bridges, and similar works were cited. The testimony indicates that such piling is commonly used either for temporary or permanent use on most of the larger construction jobs. The only positive testimony as to the extent of such permanent use is found in the statements of Augustus R. Archer, a civil engineer, who states that at least 50 per centum of the steel piling used is used in permanent construction, and of Wilbur J. Watson, a structural engineer, who states that at least one-half goes into permanent work. All the witnesses who testify upon that subject agree that the use of this material in building work is rapidly increasing. It is also shown that in cases where such piling is used temporarily it has been used as many as eighty times before being unfit for further use.

The court further stated:

The sheet piling in the case at bar plainly comes within the definition first above given.[1] It is so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures. While much of it is used under ground, lexicographers agree that a structure is not confined to that part of a building which appears above the ground. It is argued that the use of such piling being temporary, it is not a true structural material. Without attempting to foreclose discussion on this point, it is sufficient to suggest that the testimony shows that at least one-half of this piling is permanently installed in structures, where it forms a very essential and necessary part. If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification. It is shown in the case at bar that very considerable quantities of I beams and similar material are used for temporary work. If, as a matter of fact, a major portion of such material was so used, this in itself would not remove it from the classification of structural shapes. It will be observed that paragraph 312 in no way indicates that the use of structural shapes must be permanent and not temporary.

As in the *Frank* case, *supra*, where steel sheet piling was held to be structural shapes, even though at times its use was of a temporary nature, so, too, in the instant case, the court is of the opinion that the lattice form supports and solid form supports, being in fact structural shapes, cannot be precluded from classification as such, by virtue of the fact that they are usually removed after a building is completed.

There remains to be determined whether the lattice form supports and solid form supports, as structural shapes in paragraph 312 of the Tariff Act of 1930, as modified, *supra*, have been advanced beyond hammering, rolling, or casting.

From the testimonial record and from a visual examination of exhibits 1 and 2, it appears that the imported articles have been

[1] Structural shape. Engin. & arch., the shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, colloq., any steel or iron member of such shape, as channel irons, I beams, T beams, etc., or, sometimes, a column, girder, etc., built up with such members.

assembled and fabricated for use. In addition, exhibit 2 has been punched or drilled. Said assembling, fabrication for use, and punching or drilling constitute an advancement beyond hammering, rolling, or casting, within the language of the provisions of said paragraph 312.

Upon the record before the court and for the reasons above set forth, we hold that the lattice form supports and solid form supports in controversy should properly have been classified either as "Beams" or as "other structural shapes of iron or steel," which have been assembled, fabricated for use, and drilled or punched, of the kind provided for in paragraph 312 of the Tariff Act of 1930, as modified, *supra*, for which duty at the rate of 7½ per centum ad valorem is provided, as alleged by plaintiff. That claim in the protest is, therefore, sustained.

Judgment will be entered accordingly.