C. J. Tower & Sons *v.* United States (No. 4820)[1]

United States Court of Customs and Patent Appeals, March 30, 1955.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellant.
*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *Richard M. Kozinn*, special attorneys, of counsel), for the United States.

[Oral argument December 9, 1954, by Mr. Schwartz and Mr. FitzGibbon]

[1] C. A. D. 589.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, entered pursuant to its decision (C. D. 1595, 32 Cust. Ct. 138) overruling a protest on behalf of the importer against the collector's classification and duty assessment of elevator sill plates (frequently referred to throughout the record as "feralum sill plates") under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, 82 Treas. Dec. 305. Duty was assessed at the rate of 22½ per centum ad valorem.

Appellant claimed the sill plates to be properly classifiable and dutiable at 10 per centum ad valorem under paragraph 312 of the 1930 tariff act, as modified by the same General Agreement on Tariffs and Trade.

The pertinent portions of the involved paragraphs of the Tariff Act of 1930, as modified, read as follows:

Par. 397. Articles or wares not specially provided for, whether partly or wholly manufactured:

*     *     *     *     *     *     *

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

*     *     *     *     *     *     *

Other (except slide fasteners and parts thereof)_____ 22½% ad val.

Par. 312. Beams, girders, joists, angles, channels, cartruck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel: ·

*     *     *     *     *     *     *

Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 10% ad val.

At the trial before the Customs Court the importer introduced the oral testimony of three witnesses and caused several illustrative exhibits—a photograph and drawings depicting different features of the sill plates and different stages of their installation—to be placed in evidence. It may be said at this time that each of the three witnesses was either an official or employee of the Otis Elevator Company, the actual importer here involved; that each of them had been associated with the company for many years, and that each of them apparently was practically an expert in the elevator art, including both the manufacture and installation of elevators.

One of the witnesses (Percy Foster) was connected with the Otis Elevator Company, Ltd., which is located at Hamilton, Ontario,

Canada. That company manufactured the sills here involved [1] and exported them ready for use to the Otis Elevator Company of Harrison, New Jersey, in response to an order received from the latter company. He had been with the company thirty years and, at the time of testifying was "Works manager in charge of works accounting and foundry costs." He, obviously, was thoroughly familiar with the manufacture of articles of the kind here involved. He was not cross-examined by counsel for the Government. His testimony was, in part, as follows:

Q. Will you tell the court, please, how such articles are produced? A. On feralun sills we receive an order from the Harrison Works, U. S. A., together with a drawing. A pattern is made from this drawing, sent into our foundry.

Q. By "pattern" do you mean a mold? A. A wood pattern, from which a casting is made, a sill plate casting. This casting goes to our foundry and is foundry finished, then sent into the machine shop for final processing, machining, which would be in the nature of planing, drilling, and finally painted and then shipped.

Q. What is the material which is used, you say? A. Iron.

Q. And is the feralun a trade name? A. Feralun is the addition of the abrasive in the casting process.

Q. And what is the purpose of that? A. Non-slip, a non-slipping process.

Q. Would you state again just what was done after the casting is completed? A. After the casting is completed it is what we term dry-finished, that is the gates and risers are ground off. And this is then sent into our machine shop. It is planed for grooves and a number of holes are drilled according to the drawing. And then it is sent to the paint shop, painted ready for shipment.

Q. You say that these are iron castings? A. They are iron castings, yes.

Q. And is that the process which was used in producing the sill plates in the case at bar? A. Yes.

Another of the witnesses (Philip Karmel) located with the Otis Elevator Company in New York (whose business is the manufacture and installation of elevators) had been connected with the company since 1929. He stated that his position with the company was that of "the supervising mechanical engineer in the executive offices in charge of the design of doors, door equipment, door operators, and door interlocks" for elevators and that since 1929 his work had "largely been in connection with doors, door devices, door operators and electrical interlocks for doors." He gave the following description of a sill plate such as that here involved:

* * * A sill plate is a part of a hoistway door assembly used at the entrance-way to an elevator at each landing. It's a cast iron plate properly designed with grooves to guide the sliding hoistway doors, the bottom of the sliding hoistway doors. And it's fastened to the building structural steel and supports the struts and the buck and the header, the door hangers and the doors, which go to make up this assembly.

He further testified:

* * * [T]he sill is used to support the door frame to guide the doors and it's very carefully set in relation to the elevator guide rails for alignment with the elevator because the door frame and the sill support door closers or operating

---

[1] The nominal appellant here (C. J. Tower & Sons) is a brokerage concern.

devices or power operators and interlocks * * * are frequently operated from apparatus or devices carried by the elevator car. So that in order to assure alignment between the sill and the door frame and these devices the sill and door frame are set in proper relation to the guide rails.

Q. And what function is performed by the grooves in the sill plate? A. Well, the hoistway doors are sliding doors, moving horizontally, and they are equipped with small guide blocks which project down below the bottom of the door into the groove in this sill plate so that the groove guides the bottom edge of the door.

The third and last of the three witnesses (Carroll H. Fleming) called on behalf of the importer was graduated from the United States Naval Academy in 1919. He there made a study of engineering. He stated his practical experience as follows:

* * * When I graduated from the Navy I went into the active Navy on board ship. Left the Navy in '25 for employment with the Otis Elevator Company. Was granted a leave of absence in '42 to rejoin the Navy and was demobilized in '46, after which I came back to the Otis Elevator Company.

This witness, like the witness Karmel, was also questioned by counsel for the importer and cross-questioned by counsel for the Government with reference to the weight carried by or resting upon the sills. This we discuss hereinafter.

At this juncture, we take occasion to state that both Karmel and Fleming were permitted to express their opinion, during the taking of their testimony, as to how the involved merchandise should have been classified. While the admission of such testimony is not improper, the courts are not in any respect bound by it and, so far as this particular case is concerned, it might as well have been omitted.

The testimony describing the merchandise, however, is deemed to be important.

No evidence of any kind was introduced on behalf of the Government. So, there was no effort to contradict that introduced on behalf of the importer and Government counsel rely solely upon the presumption of correctness which, by law, attaches to the collector's classification upon the basis of which the duty rate was determined. If the classification was correct, the duty rate was correct.

The two paragraphs here involved are paragraphs in Schedule III—Metals and Manufactures—of the Tariff Act of 1930. In that schedule, the paragraphs relating to metals appear and these are numbered 301 to 398, inclusive. Paragraph 397 constitutes the "basket clause" of the schedule. Insofar as here pertinent, it has been quoted, as modified by the Trade Agreements Act, *supra*. It will be noted that it includes provision for "articles or wares, *not specially provided for*, if composed wholly or in chief value of iron, * * *." [Italics ours.]

Paragraph 312 *specially provides* for a number of articles including structural shapes of iron.

We think it obvious that if the merchandise involved be found to be a structural shape of iron, it does not fall within the so-called "basket clause."

As we understand the decision of the trial court, it held, in effect, that it had not been proven by the importer that the involved sill plates were structural shapes within the meaning of paragraph 312, *supra*, and for that reason held it classifiable under the phraseology of paragraph 397. Specifically, the court held:

Upon a careful review of the record and the various authorities cited by the parties, we find and hold that the sill plates in controversy are not structural shapes within the contemplation of paragraph 312, *supra*, as claimed by plaintiff, and since our attention has not been directed to any more specific provision, we hold that they were properly classified by the collector of customs as articles or wares, not specially provided for, whether partly or wholly manufactured, wholly or in chief value of steel, and dutiable accordingly. The protest is therefore, overruled.

It is obvious, from reading its decision, that the trial court felt that to a great extent, certain of the prior decisions of this and other courts were controlling.

The determination of what is meant by the expression "structural shape" has been the subject of litigation over a long period of time and under different tariff acts. Cases involving it are cited in the decision of the trial court as follows:

*Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537;

*Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T. D. 40490;

*United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184;

*United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079;

*E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240;

*Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449, T. D. 44700;

*European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225;

*Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038;

*Otis McAllister & Co.* v. *United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52;

*The Frost Railway Supply Co.* v. *United States*, 39 C. C. P. A. (Customs) 90, C. A. D. 469;

*United States* v. *Winkler-Koch Engineering Co.*, 41 C. C. P. A. (Customs) 121, C. A. D. 540.

If we correctly understand the decision of the trial court, it seems to have been influenced largely by the decision in the *Simon, Buhler & Baumann* case, *supra*, respecting the matter of sustaining heavy weights or to resist great tension, or both.

Apparently, it did not take into consideration the decision of this court in the *Judson Freight Forwarding* case, *supra*, wherein we said that weight is a relative term, meaning, of course, that the weight

of the structural article must be considered in the light of the purpose for which it is used.

That case arose under the 1922 tariff act and involved the classification of certain steel angles which had been held by the Customs Court (seemingly largely upon the authority of this court's decision in the *Simon, Buhler & Baumann* case, *supra*,) not to be structural shapes within the meaning of paragraph 312 of the 1922 act, which is practically a prototype of paragraph 312 of the 1930 Act, here involved.

In the course of the majority opinion in that case it was said (see 20 Ct. Cust. Appls. at page 234):

> The language, "the capacity to sustain heavy weights or to resist great tension or both," used by the court in that decision, is open to widely divergent interpretations. However, if it is read in connection with other language in the decision and the issues there involved, it is obvious that the court did not intend to define, except for the purposes of that case, the statutory term "structural shapes." It was there pointed out that structural shapes were used not only in buildings and ships but, also, in many other structures, "anything," as the court said, "composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use." We might add that in that case the court was not aided by a summary of tariff information such as is before the court in the case at bar.

The *Exstein* case, *supra*, wherein certain steel bars were held by this court to be classifiable under paragraph 312 of the 1922 act was then discussed, and also the proper weight to be given to the Summary or Tariff Information. The majority decision then continued (see 20 Ct. Cust. Appls. at page 236):

> * * * Accordingly, we are of opinion that the Congress did not intend to limit the term "structural shapes" to such shapes of iron and steel as were used only in large structures, but that it intended to include therein all structural shapes of iron or steel having the "capacity to sustain [relatively] heavy weights or to resist great tension or both," and designed for the utilization of such capacity, to be used as such shapes, and suitable for such use in buildings, bridges, ships, cars, etc., requiring either heavy or light sections, or both, and also in certain "other articles *requiring light sections*" only. [Italics quoted.]

In the brief for the Government before us, it is said, after mentioning some of the cited cases: "Bearing in mind that no precise definition can be laid down for the involved terms an analysis of the cases on the subject is necessary.", and proceeded to make such analysis.

We have examined the analysis with care. It really amounts to little, if anything, more than a recital of articles which have been held to be structural shapes and other articles which have been held not to be structural shapes.

There is no article in either class which is similar, either in its characteristics or its use, to the elevator sills here involved. So we derive little aid—practically none—from making comparisons of articles.

The evidence in the instant case, we think, established beyond possibility of doubt that the involved elevator sills were manufactured to serve a particular and indispensable function in the operation of elevators. For example, one indispensable structural feature of the sill is the groove through which the hoistway door is held in close line in opening and closing the hoistway doors.

We are unable to conceive of any other art or industry in which the sills, in their imported condition, would be of the slightest use.

They have the particular shape which their particular function requires. Surely, when the common meaning of "structural shapes" is considered, the merchandise meets every possible definition of the phrase, and this court held, in the *Judson Freight Forwarding Company* case, *supra*, that the phrase should be applied on the basis of its common meaning.

For reasons indicated, we feel constrained to disagree with the decision of the trial court.

Therefore, the judgment appealed from is *reversed* and the case is ordered *remanded* for further proceedings not inconsistent with this decision.

JOHNSON, Judge, dissenting.

I respectfully dissent from the conclusion of the majority in this case.

The statutes involved are stated in the majority opinion, and the question for this court to answer is whether the described sill plate for an elevator hoistway door is a structural shape within the meaning of paragraph 312 of the Tariff Act of 1930, as contended by appellant. If it is not, then the collector's classification under paragraph 397 should be allowed to stand under the presumption of validity which attaches thereto.

Questions involving the meaning of the term "structural shapes" have been before this court many times, as shown in the list of cases cited in the majority opinion. However, no precise definition can be laid down to cover the term, and each case must be determined in the light of its own record. *The Frost Railway Supply Co.* v. *United States*, 39 C. C. P. A. (Customs) 90, and cases cited therein.

In *The Frost Railway Supply Co.* case, *supra*, the court rejected appellant's contention that "railway snubbers" were structural shapes within the meaning of paragraph 312. In that case the court reviewed the prior cases in which it interpreted paragraph 312. These cases are selectively relied on by both parties. Since these decisions are very pertinent to my conclusion in the present case, I will quote at length from *The Frost Railway Supply Co.* case, *supra*.

The following cases, which were discussed in the *Frost* case, show

what the court has, on past occasions, considered to be structural shapes:

In the case of *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, this court made its first inquiry into the scope of paragraph 104 of the tariff act of 1913, the forerunner of paragraph 312 of the current act. Steel channel irons, steel bars or grates, and frames, plates, center pieces, posts, and heads or end pieces of cast iron, materials ready to be assembled as parts of a mash filter, had been refused classification as structural shapes, the government contending that none of the articles were *ejusdem generis* with those provided in paragraph 104, and that they were not intended to be used in the construction of buildings or of ships. This court could not agree that Congress intended to confine the materials of paragraph 104 to such as are used for buildings, ships and similar erections, but was of a mind that the structures there intended were of a more general nature. The belief was professed that "the expression 'structural shapes' does import to people in general a capacity to sustain heavy weights or to resist great tension or both." As the merchandise before the court was deemed of that nature it was held classifiable as structural shapes.

In *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, certain steel sheet piling was held to be properly classified as structural shapes of iron or steel under paragraph 312 of the Tariff Act of 1922. We there noted that for years the material had been definitely, uniformly, and generally treated and used by the steel trade as structural shapes, and citing the *Simon, Buhler* case, *supra*, we held the sheet piling to be within the purview of the definition there annunciated.

In the case of *United States* v. *Henry L. Exstein Co., Inc.*, 16 Ct. Cust. Appls. 328, T. D. 43079, so-called deformed steel bars for reinforcing concrete came before the court. The bars were the familiar reinforcing bars whose surfaces bore ridges and protuberances to aid the bars in holding when imbedded in concrete. As imported the bars were straight. This court, observing that the bars were bought and sold in the markets of the United States and used precisely as other structural shapes of steel, pointed out that though these bars might be considered a border line material, they were nevertheless classifiable as structural shapes in accordance with the teaching of the *Simon, Buhler* and *Frank* cases, *supra*.

In the case of *Judson Freight Forwarding Co.* v. *United States*, *supra*, we rejected the chief or exclusive use doctrine as determinative of classification under paragraph 312, and held that Congress did not intend to limit the term "structural shapes" to such shapes as were used only in *large* structures, but intended to include "all structural shapes of iron or steel having the capacity to sustain [relatively] heavy weights or to resist great tension or both." We accordingly held certain 2 x 2 x ⅜ inch angles to be classifiable under paragraph 312.

.. In the case of *United States* v. *Julius Blum & Co., Inc.*, 26 C. C. P. A. (Customs) 168, C. A. D. 12, this court again had before it a decision of the Customs Court wherein the doctrine of chief use had been relied upon to classify under paragraph 312 certain steel sections varying in length from 18 to 20 feet and in width from 15/16ths to 2 and 1/8th inches and described on the invoice as "structural angles and channels." In our decision we reiterated our stand in the *Judson Freight Forwarding Co.* case, *supra*, and again rejected the doctrine of chief use as determinative of the question. The case was remanded for further consideration by the trial court.

The following cases, which were discussed in the *Frost* case, show what the court has, on past occasions, considered not to be structural shapes:

In the case of *Myers & Co.* v. *United States*, 12 Ct. Cust. Appls. 350, T. D. 40490, connecting rods for locomotive drive wheels were before us and were held not classifiable as structural shapes of iron or steel. It was pointed out that while the mash filter in the *Simon, Buhler* case, *supra*, was a structure and not a manufacture of metal, a railway locomotive was not such a structure.

In *E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240, it was contended that universal mill plates, which are plates of steel 3/4ths of an inch thick, about 40 feet long and 8 to 18 inches wide, were properly classifiable as structural shapes of iron or steel. This court held, however, that structural shapes were more than mere material, more than structural steel, and that consequently the universal mill plates could not be classified as structural shapes within the meaning of the tariff act.

In *Amerlux Steel Corp.* v. *United States*, 18 C. C. P. A. (Customs) 449, T. D. 44700, it was held that checkered, or raised diamond, steel floor plates were not classifiable under paragraph 312 of the Tariff Act of 1922 as structural shapes.

In *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225, certain wire netting used for no purpose other than holding stucco on the sides of structures or buildings was held properly classified by the collector under paragraph 399 of the Tariff Act of 1922 rather than under paragraph 312 of the same act. We there opined that if the deformed steel bars of the *Exstein* case, *supra*, were on the border line, wire netting was entirely beyond the border line.

In *Otis McAllister & Co.* v. *United States*, *supra*, an importer contended for the classification of galvanized, corrugated iron sheets under paragraph 312 of the Tariff Act of 1930. The sheets were principally used in the construction of buildings and formed the walls and roofs thereof. This court, pointing out that no precise definition of structural shapes could be laid down, and noting that the sheets of themselves were not designed to carry a building load or stress, held that the imported merchandise was properly adjudged dutiable as sheets of iron or steel corrugated, under paragraph 308.

In addition to the cases discussed in *The Frost Railway Supply Co.* case, *supra*, the subsequent case of *United States* v. *The Winkler-Koch Engineering Co.*, 41 C. C. P. A. (Customs) 121, also considered the question of structural shapes under paragraph 312. In that case hollow, cylindrical seamless sections made of steel, 7 inches in diameter and 32 feet long and having threaded ends were held to be structural shapes. These sections were to be joined to form a casing for an oil well. It appears that the court reasoned that the casings must resist great external pressure to protect a bored hole against destruction, and that since the forces causing this pressure are as great as those upon a beam, girder, joint, or angle, and since the casings must be joined in the same manner as the beams of a building, they should be considered as structural shapes.

Thus, it can be seen that this court has in the past held the following merchandise to be structural shapes within the meaning of various tariff acts: steel channel irons, steel bars or grates, and frames, plates, center pieces, posts, and heads or end pieces of cast iron— materials ready to be assembled as parts of a mash filter; sheet piling; deformed steel bars for reinforcing concrete; small angles; and well casings.

On the other hand, this court has in the past held the following merchandise not to be structural shapes: connecting rods for locomotive drive wheels; universal mill plates; checkered steel floor plates to be used as flooring in buildings and boiler rooms; wire netting for holding stucco on the sides of structures or buildings; corrugated iron sheets used to form the walls and roofs of buildings; and railway snubbers.

In addition to the analyses of previous decisions, definitions of structural shapes also were cited from dictionaries · and technical works in *The Frost Railway Supply Co.* case, *supra*, as follows:

On occasion in the past, *United States* v. *Julius Blum & Co., Inc., supra,* and case cited therein, we have quoted the following dictionary definition of "structural shape:"

Structural shape, *Engin. & Arch.,* the shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, Colloq., any steel or iron member of such shape, as channel irons, I-beams, T-beams, etc., or, sometimes, a column, girder, etc., built up with such members.

The *Condensed Encyclopedia of Engineering,* first edition, The Industrial Press, New York, p. 1068, gives the following under the heading "Structural Shapes:"

Steel rolled to standard sections is widely used in building construction and in the manufacture of railway cars, agricultural implements, automobiles and numerous other products. By using a standard shape which is on the market and is adapted to a given structure or design, it is often possible to secure a stronger, lighter construction and a reduction of manufacturing cost. Shapes which have been widely used are shown in the accompanying illustration. There are many other more or less special shapes for use in the agricultural, automotive, railway car, ship-building and other large industries.

The illustration referred to shows sections of channels, angles, bulb angles, H-beams, tees, zees and rails.

Marks' *Mechanical Engineers' Handbook,* third edition, McGraw-Hill, pp. 1564–1580, lists the properties of standard structural shapes, channels, angles, tees, I-beams, T-beams, etc., and it is apparent that all of the structural shapes there listed are straight pieces of indefinite length.

It seems to me that when our previous decisions are viewed in the light of the above cited dictionary and technical definitions of structural shapes that a broad rule can be formulated, which is applicable to. this class of cases. This rule is: If the item under consideration has a primary function of giving strength and rigidity to the structure into which it is to be incorporated, although it may also serve some incidental purpose, and the item is one which has a standard shape and has general application in building various types of structures, then it is a structural shape within the meaning of the statute; but if the item has a primary general purpose which is not to give strength and rigidity by itself to the structure into which it is to be incorporated, although it may incidentally give strength and rigidity, and the item is one which does not have a standard shape or general application

in the building of various types of structures, then it is not a structural shape within the meaning of the statute.

It is to be noted that the foregoing rule does not rely on the exclusive or chief use doctrine (i. e. chief use in relatively heavy structures such as buildings, ships, derricks, etc.) which was stated in the *Simon, Buhler & Baumann* case, *supra*, and rejected in the *Judson Freight Forwarding Co.* case, *supra*. It is to be further noted that the foregoing rule does not rely on the rule of *ejusdem generis* which was adapted by this court in the *European Trading Company* case, *supra*, and for all practical purposes rejected in the *Winkler-Koch Engineering Co.*, case, *supra*, wherein it was stated at 134 and 135:

> However, deductions may be drawn from decided cases, many of which are herein cited, covering at least some of the characteristics which an article must possess in order to be properly classifiable as a structural shape and there is, doubtless, room for resort to the rule of *ejusdem generis* for purposes of comparison, but it should be borne in mind that, with the exception of what we regard as *obiter* in the *European Trading Co.* case, *supra*, no case involving "structural shapes" such as those contemplated by that phrase in paragraph 312, *supra*, has been cited (nor has any been found) in which any appellate * * * court rested a decision upon the ground that the article involved should be excluded from classification under the paragraph by reason of the rule of *ejusdem generis*.

Although I am well aware of the danger of setting forth any general rules in the sense that they are subject to certain exceptions, I believe that the foregoing stated general rule can, for the most part, be shown to be inherently present in our previous decisions, as set forth in detail hereafter.

In the *Myers & Co.* case, *supra*, connecting rods for locomotive drive wheels were held not to be structural shapes. These connecting rods must of necessity have possessed great strength and rigidity. However, their primary function was to transmit mechanical motion. They had a very specific application, namely, for use on locomotives. They did not have a standard shape and could not be used generally in the building of structures. Thus, these connecting rods fall under the above rule as not being a structural shape.

In the *Amerlux Steel Corp.* case, *supra*, checkered steel floor plates were held not to be structural shapes. The primary function of these plates was for use as flooring. They necessarily must have had great strength and rigidity and must have inherently lent a certain amount of stability to the structure into which they were incorporated. But these plates had a very limited application. They did not have a standard shape and could not be considered to be used generally in the building of structures. Thus these floor plates fall within the above rule as not being structural shapes.

In the *European Trading Co.* case, *supra*, wire netting was held not to be a structural shape. It necessarily must have possessed certain strength. It is to be noted that wire netting does have general

application in the field of building structures. However, the primary function of the wire netting is to hold stucco on the sides of buildings, but it cannot by itself lend strength and rigidity to a structure. Thus it falls within the above rule as not being a structural shape.

In the *Otis McAllister & Co.* case, *supra*, corrugated iron sheets were held not to be structural shapes. It can be said that these items had certain strength and rigidity, and that they can be generally used in building structures. Yet the primary function of these sheets was to form the roofs and walls of buildings. Although they inherently lent a certain amount of strength and stability to the building in this capacity, their primary purpose was as a covering. The sheets could not lend strength and rigidity by themselves. Thus these sheets fall within the above rule as not being a structural shape.

It can be seen that the foregoing rule, as applied above, obviously encompasses the railway snubbers of *The Frost Railway Supply Co.* case, *supra*, and shows them not to be a structural shape.

In *United States* v. *Frank, supra*, certain steel sheet piling was held to be structural shapes. It can be seen that these items have the primary function of giving strength and rigidity to structures in which they are used; and that they have general application in building of various types of structures. Thus these pilings fall within the above rule as being structural shapes.

In the *Henry L. Exstein Co., Inc.* case, *supra*, the court held reinforcing bars to be a structural shape, although it pointed out that the bars might be considered a borderline material. The above rule applies to that case in the sense that the bars have the primary function of giving strength and rigidity to the structure in which they are incorporated, although they serve an incidental purpose of strengthening concrete in which they are imbedded. Furthermore the bars are of a standard shape and have a general application in the fabrication of buildings. Thus the bars fall within the above rule as being structural shapes.

The above rule also encompasses the angles of the *Judson Freight Forwarding* case, *supra*, which were held to be structural shapes. The same can be said of the "structural angles and channels" of the *Julius Blum & Co.* case, *supra*, and of the casings of the *Winkler-Koch Engineering* case, *supra*.

It thus can be seen that the above rule which was formulated from our previous decisions encompasses the subject matter which was under consideration in each of the above discussed cases.

I feel that the sill plates under consideration in the present case are not structural shapes within the interpretation given to the term by the previous decisions as summarized by the above formulated rule. It cannot be disputed, from a review of the evidence as set forth in the majority opinion, that the primary purpose of the sill plate is to sup-

port elements of the elevator door. It also cannot be disputed that it must have certain inherent strength to perform this function. Yet it seems to me that the sill does not primarily serve the purpose of lending strength and rigidity to the building structure in which it is located. It does this only in an incidental manner. Furthermore, I cannot see where the sill is a standard shape or has general application in building of various types of structures. It cannot even be used interchangeably with other types of elevator sills. On the contrary, it was fabricated for a very specific purpose, as stated above, and its use is limited to that purpose.

Furthermore if the two classes of above enumerated cases which hold what is and what is not structural shapes are compared, I believe that the conclusion is inescapable that the sills fall into the latter category. More specifically, I believe that the sills are more analagous to the above discussed floor plates, wire netting, corrugated iron sheets, and railway snubbers than to the above discussed steel channel irons, sheet piling, deformed steel bars, small angles, and well casing.

I feel that appellant's argument that the sills are structural shapes because they "are designed, among other things, to sustain heavy weights, to carry building loads or stresses, and to give the greatest strength with the least material" is without merit. It can almost be categorically said that every element which is used in fabricating any type of structure must have these qualities. Yet it is quite obvious from our previous decisions that every element which is used for building structures and which has the above quoted properties is not necessarily a structural shape within the meaning of the statute.

In addition to the foregoing discussion of the previous cases decided by this court, I believe that the following is pertinent to the present case.

In the *Judson Freight Forwarding Co.* case, *supra*, the court held that the phrase "structural shapes" should be applied on the basis of its common meaning. This is stated in the present majority opinion. It is well settled that in determining the common meaning of a term, the court may, as an aid, consult the dictionaries, lexicons, and written authorities as to such common meaning. *United States* v. *A. Moscini*, 19 C. C. P. A. (Customs) 144. I, therefore, wish to point specifically to the above cited portion of the *Condensed Encyclopedia of Engineering*. In this portion reference is made to both "standard sections" and "special shapes." The encyclopedia states, "By using a standard shape which is on the market and is adapted to a given structure or design, it is often possible to secure a stronger, lighter construction and a reduction of manufacturing cost." It is further stated that the standard sections are widely used in building construction and in the manufacture of railway cars, agricultural implements, automobiles, and numerous other products. The encyclopedia also states "There

are many other more or less special shapes for use in the agricultural, automotive, railway car, ship building and other large industries.'' This means that there are shapes not shown in the illustration in the encyclopedia which have general application in the building industry, and which can be obtained on the market for general usage. It is quite obvious to me that the elevator sills, under consideration here, are not "standard shapes" or "special shapes" which are on the market. They are specific shapes which were cast and machined for a specific purpose. They are not widely used in building. They were fabricated for a specific purpose, and for that purpose alone. They have no other application than for use as elevator sills. Since the elevator sills do not conform to the definition of "standard shapes" or "special shapes" as set forth in the encyclopedia, I do not feel that they are structural shapes within the meaning of the statute.

I have carefully analyzed the record of this case. The importer, Otis Elevator Company, presented three of its employees as expert witnesses. The substance of their testimony is set forth in the majority opinion, and need not be repeated here. In addition, the importer's witness Karmel attempted to show that the sills were structural shapes. The following is quoted from the record in this respect:

Q. Do you know what angles, channels, and tees are? A. I do.

Q. For how many years have you had experience with angles, channels, and tees? A. Since I have been employed, since 1920, say.

Q. And have you seen many angles, channels, and tees? A. I have.

Q. And has that been in connection with your work with your company? A. Yes.

Q. Now, can you tell us whether these sill plates are similar to angles, channels, and tees? A. They are.

Q. In what way? A. Well, they are a section that is used to support the door structure. They are arranged with suitable conformation or design to support this structure and they are varied in length in accordance with the application to which they are, or in accordance with the use to which they are applied, the condition to which they are applied.

Q. Are they ready for use in their condition as imported? A. Yes.

Other of the witnesses gave generally similar testimony. Aside from the testimony of these witnesses, who testified on the behalf of their employer, the importer presented no other proof as to the meaning of the term "structural shapes" except for his reliance on our previous cases which I have already discussed.

It is too well settled for citation that there is a presumption of correctness which attaches to the Customs Collector's classification and that the importer has the burden of proving that the Customs Collector is wrong and that he (the importer) is correct. I do not feel that the importer has sustained this burden since he has neither conclusively proved that the collector was wrong nor that he is correct. The importer has not cited any authoritative sources which

have given definitions of the term structural shapes. He has merely presented his own employees as witnesses. In short, he has not proved that the imported sills are structural shapes within the meaning of the statute.

For the foregoing reasons, I feel that the judgment of the Customs Court should be *affirmed*.

WORLEY, J. concurs in the conclusion of the dissenting opinion.